## THE PEOPLE *v.* BEALOBA.

UNDER our statute, murder in the first degree consists of a willful, premeditated, unlawful killing; the intent to kill must exist, and this intent may be inferred from the circumstances, as the use of a weapon calculated to produce death. This intent need not have existed for any given length of time before the fatal blow; it is sufficient, the killing being unjustified or unexcused by the circumstances, that the intent to kill, if it be formed, be on the instant of killing or doing the act from which death ensued.

In the cases where the killing is done in the perpetration of the felonies, or the attempt to perpetrate the felonies mentioned in the statute, murder in the first degree may be committed, though no intent to kill existed at the time of the fatal blow—as if the criminal shot at the deceased for the purpose of disabling him, or the like.

In a criminal case, to reverse the judgment below the record must affirmatively show error. The fact that the record states generally that the prisoner was absent during a portion of the trial, is insufficient to reverse the judgment. The record should show when, or for what time, or at what part of the proceedings the prisoner was absent, so that this Court can judge of the effect to be given to such absence.

Where, on trial for murder, the Court first permitted a witness to prove that deceased, after he was shot, stated—" Well, I had the satisfaction of having fired the first shot," and afterwards in its charge to the jury excluded this testimony as hearsay: *Held,* that this was not error; that at least when the Court came to charge the jury the prisoner should have applied for leave to introduce other testimony, if he was surprised at the exclusion, and really relied on this proof to establish the point in controversy.

*Held, further,* that the defendant ought, on motion for new trial on the ground that this testimony was thus excluded—the motion being based on affidavit by counsel of defendant that he was surprised by the exclusion of the testimony, and that he had during the trial another witness who could have proved the fact that deceased fired the first shot, and whom counsel could have introduced but for the admission of deceased's statement, and that this witness was now within reach of Court—to have tendered the affidavit of this witness, or have shown that it could not be had.

APPEAL from the Sixteenth District.

Indictment for murder. The killing occurred at a dance house, where an officer had gone to arrest some supposed horse thieves, taking with him Dr. Roberts, the deceased, to identify them. Having arrived at the house, Roberts pointed out defendant and advised the officer to arrest him as a vagrant. After some talk, the defendant having a drawn pistol pointing downwards, began backing out

of the house, and when in the street raised it and shot Roberts, who was near the door.

As to the absence of the prisoner during a portion of the trial, the only facts shown by the record are the following extracts from the statement on appeal: 1st, " the indictment was tried on the sixteenth day of August, 1860, at the August term of said Court, by a jury, a portion of which trial was had in defendant's absence ;" 2d, " on Monday, the twentieth day of August, the Court in the absence of said defendant made an order fixing Tuesday, the twenty-first day of August, 1860, for sentence to be pronounced upon the defendant."

As to the exclusion of hearsay testimony previously admitted, the facts are, that after the prosecution rested defendant introduced a witness, Bowman, who testified as follows: " I heard Roberts, the deceased, make a statement as to who shot first. This was in his own house after he had been carried there. He appeared to be in good spirits; was talking, although his lower limbs were paralyzed. He then said, ' I have the satisfaction of having fired the first shot.' " This was all the evidence on the part of defendant.

In the charge of the Court to the jury occurs this passage, to wit: " There is no legal evidence before you that deceased either drew a pistol or fired it. None of the witnesses saw him have a pistol ; none were conscious of hearing it go off; but one of them heard deceased say that he had fired. This was only hearsay, but I permitted it to go to the jury because of the manner in which the offer was made. I now charge you distinctly that hearsay is not evidence in law, and I will leave you to determine whether you will believe the mere hearsay of one man, or the testimony of living witnesses." Defendant took a general exception to the whole charge.

Defendant moved for a new trial on the grounds—1st, that the Court misdirected the jury in matter of law ; 2d, of surprise which ordinary prudence could not have guarded against; 3d, that a portion of the trial herein was had in the defendant's absence. The motion was based, so far as the second ground is concerned, upon an affidavit by the counsel of the defendant to the effect, that the ruling out, by the Judge's charge, of the testimony of Bowman

that Roberts, the deceased, had said "Well, I have the satisfaction of having fired the first shot," was a surprise upon defendant and his counsel; and that "defendant had present in the Court room a witness by whom he could have proven that Roberts, the deceased, did fire a pistol, and that he did fire the first shot as Roberts had told Bowman; but that having proven Roberts' declaration of that fact, it was deemed by counsel superfluous to call said witness, as it would have been only cumulative testimony, and that said witness is now within reach of Court." Defendant, being convicted of murder in the first degree, appeals.

*Robinson, Beatty & Heacock*, for Appellant.

I.   The Court erred in permitting any portion of the trial to be had without the presence of the accused.   (Wood's Dig. 294, sec. 1596.)

II.   The Court erred in the charges it gave to the jury.

III.   The Court erred in ruling out evidence which had been given without objection, which evidence was material to the defense.

*Thomas H. Williams, Attorney General*, for Respondent.

Three assignments of error are made by appellant's counsel.

I.   That a part of the trial took place in the absence of the defendant.   It does not appear from the record how long, at what time, or under what circumstances the defendant was absent.   Error, therefore, is not made manifest.   There are some circumstances under which an absence might be error, and some under which it would not.   It is unnecessary, however, to discuss this point, as an examination of the whole record developes the fact that the absence spoken of was at the time the order was entered fixing the day for sentence.   This is not error.   (*People* v. *Galvin*, 9 Cal. 115.)

It appears that the Court, in the absence of the defendant, fixed the time of judgment, etc.   But the record shows affirmatively that at every other stage of the proceedings the defendant was present *in person* and by counsel.

II.   That the Court erred in admitting certain testimony, and afterwards excluding it from the jury.

This was assigned as a ground for new trial, under the head of

" accident or surprise, which ordinary prudence could not have guarded against." And the refusal to grant said new trial upon said ground is claimed as cause for reversal.

The counsel mistook the civil for the criminal practice in the Courts of this State. The District Court had no power to grant a new trial on the ground assigned ; on the contrary, it was expressly forbid doing so. (Wood's Dig. 304, art. 1679.)

If the Court below had no power to grant a new trial upon the ground assigned, this Court will not consider the merits of the question upon the facts. But waiving the answer just made, there is another which is conclusive. There could have been no surprise (in law) on account of the exclusion of incompetent testimony. It could only follow the exclusion of evidence upon the ground of the incompetency of the witness. The latter, if excluded in time, might be supplied by the introduction of another witness, whilst the former could not. The fact that the testimony now under consideration was incompetent, is not denied ; and it is also admitted that all other witnesses proposed for the purpose of giving the same evidence might have been excluded. But we are told that the same result could have been attained by the introduction of other witnesses, whose testimony would have been unobjectionable. Admit this, and yet the defendant has no just cause of complaint. Ordinary prudence would have guarded against the surprise by the introduction of the strongest evidence to the point in existence, and would not have relied upon that which was weak and liable to be excluded.

It is not stated who this witness was, or whether he was competent or reliable. No opportunity, therefore, is afforded the prosecution to contradict or disprove the statement. Nor does the affidavit of said witness, setting forth that he would swear as alleged, accompany the statement as it should.

III. The Court did not err in its charge to the jury in defining the acts which amount to murder in the first degree. ( *Commonwealth* v. *Green*, 1 Ashmead [Penn.] 296–300 ; *Commonwealth* v. *Murray*, 2 Id. 43 ; *Commonwealth* v. *Keeper of the Prison*, Id. 231 ; 1 Leigh, 667–671 ; 1 Meigs, 276, 277 and authorities ; *State* v. *Dunn*, 18 Miss. 424 ; *State* v. *Jennings*, Id. 443 ; *People* v. *Moore*, 8 Cal. 90.)

People *v.* Bealoba.

BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

The main question in this case to which our attention is especially directed, is the charge of the District Judge defining murder in the first degree, and giving a construction to the statute on this subject.    The Court told the jury that " the difference between murder in the first and second degree is so subtle as frequently to puzzle the mind, and render difficult the solution.    When the term premeditation or deliberation is used, the juror is apt to consider that some time is necessary for deliberation ; but this is not necessary ; it is only requisite that the design to kill has been formed, and it may be executed in a minute, in an hour, or a day, and it is murder ; while in all cases of murder in the second degree there must not be any mixture of deliberation, and I cannot more properly illustrate this point than by adopting the language of the Supreme Court of Pennsylvania.    The first inquiry, therefore, of a California jury, after a felonious and malicious homicide is established, and not committed by means of poison or lying in wait, is to determine whether the mortal shot was fired with intent to take life, or merely to do bodily harm ; if with the intent to take life, it is murder in the first degree ; if merely to inflict bodily harm, it is only murder in the second degree.    ' Let it be supposed that a man without uttering a word should strike another on the head with an ax, it must, on every principle by which we can judge of human actions, be deemed a premeditated act.'    Again, where one with a loaded pistol takes deliberate aim, and shoots another, it is held to be murder in the first degree."

The statute (Wood's Dig.) is, all murder which has been perpetrated by means of poison, lying in wait, torture, or other kind of willful, deliberate and premeditated killing is murder in the first degree ; all other kind of murder, is murder in the second degree. It has been supposed and plausibly argued in this State, and in other States having a similar statute, that the language of the act defining murder in the first degree was designed only to include homicides committed under like circumstances with those given in the first clause, *as* by means of poison, lying in wait, or torture ;

that is, that to constitute murder in the first degree, the act must be premeditated, willful and deliberate, *such as* by means of poison, lying in wait, or torture—the latter words being mere examples of the class of murder intended to be embraced; and the clause, therefore, not including other murders than those characterized by the same or similar proofs of deliberation. But this was not the meaning of the Legislature. The acts of homicide by poison, etc., carry with them conclusive evidence of premeditation, and the jury would have no option but to find the prisoner guilty in the first degree, upon proof of the crime; but it does not follow that the same result should not flow when other proof of deliberation than that afforded by these circumstances existed. For the statute is express, that " *all other* kind of deliberate, willful and premeditated murder is murder in the first degree." To fall within this class, the crime must be premeditated, willful and deliberate. These adjectives are, as used, nearly synonymous. A man may do a thing willfully, that is, intentionally and deliberately, from a moment's reflection, as well as after pondering over the subject for a month or a year; he can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation. There is nothing in the statute which indicates that the Legislature meant to assign any particular period to this process of deliberation or premeditation, in order to bring the act within the first degree. Nor could it well have done so. A ruffian, out of mere wantonness, firing into a crowd upon a sudden motion, is as guilty as if he had lain in wait for his victim. These terms " deliberate—willful—premeditated," are used in the English books, and were well known to the framers of our act; and they have the same meaning, and were known to be used in the same sense at the common law, as that which we have here ascribed to them. At the common law there were no degrees of murder. Every homicide committed with malice, express or implied, was murder. But this malice might be, and frequently was, unaccompanied by deliberation or premeditation, or the intent to kill. A man might kill another in sudden heat, without premeditation, when no provocation, or inconsiderable provocation, existed, and the crime would be murder—as where one slew another in sudden pas-

sion, but without intending to kill him, with a deadly weapon, even after a slight assault—the deceased being unarmed.   But our statute was designed to reduce the crime when committed under these circumstances; but this mitigation does not apply when the act of killing and the intent to kill are deliberate and premeditated.   In several of the States of the Union, the same or similar provisions as those in our statute are found; and they have been construed as we have intimated.   Thus in Pennsylvania, in the case of the *Commonwealth* v. *Green* (1 Ashmead, 296) the Court say : " By the admirable enactment of 1794, the whole doctrine of constructive murder, as it may be called, ceased in Pennsylvania, so far as to involve the life of the accused; such murders being nothing more than murders in the second degree.   To constitute murder in the first degree, the unlawful killing must be accompanied with a clear intent to take life.   This is the great distinguishing feature between murder in the first and murder in the second degree ; between murder as it is understood in Pennsylvania, and as it is understood in England.   In England, if death ensues from any unlawful act of violence, the slayer, although there existed no intention to kill, but only to do bodily harm, is guilty of murder.   In Pennsylvania, except in the cases enumerated in the Act of Assembly, the malice in any act of homicide must be directed against the life of a human being, in order to render the slayer guilty of murder in the first degree.   When, however, the facts of a homicide exhibit that the killing is done with an intent to take life, and the act accompanied by no circumstances of justification, excuse or extenuation recognized by law, the crime is murder in the first degree.   It is true that the act of Assembly which defined the crime of murder in the first degree makes use of strong language, but that act has received a construction cotemporaneous with, and as fixed as the act itself—a construction calculated to effect the true ends of the Legislature, as to prevent the law from being the shield and panoply of a murderer, as it otherwise would be.

" The first inquiry then, in these investigations, is whether the act of homicide was committed with an intention to kill.   Nothing affords more conclusive evidence of this bloody intent than the instrument used in the killing.   If one man discharges a bullet

through the body of another, if he cuts him down with an ax, or pierces him through a vital part with a sword, the intention to kill is manifest and irresistible. To infer that an intention to kill does not accompany such an act of fierce and deadly violence, is to surrender our common sense when we enter into the administration of justice, and to proclaim to the wicked and licentious that there is a mode of estimating human actions in the jury box calculated to give impunity to the murderer. But the law is not the apologist of human wickedness. Created from the necessities and for the protection of society—intended to deter that eternal tendency which exists in fallen man to sin—it will and does judge of his acts according to their ordinary nature. When the killing is ascertained to be intentional, the next inquiry is whether it was willful, deliberate and premeditated.

" As to the first, every intentional act is necessarily a willful one. The one implies the other. Deliberation and premeditation mean that the act was done with reflection—was conceived beforehand. No precise time is fixed by law or common sense for this deliberation. If a man has time to deliberate and think—for a minute, as well as an hour or a day—it is sufficient. If a particular time for deliberation or premeditation should be required, at what period ought it to be fixed? No practical answer can be given to the question. Early after the passage of the act of 1794, the construction I have alluded to and explained was given to the act by the highest judicial authorities of the Commonwealth, and it is a binding rule upon us in deciding as to the degree of guilt imputable to any man who is proved to have unlawfully killed another."

This doctrine was affirmed in *Com.* v. *Murray* (2 Ashmead, 43); *Com.* v. *Keeper*, (Id. 231). And in *Jones' case* (1 Leigh, 609, side) Judge Daniel, delivering the opinion of the Court, says: " To determine whether it be murder in the first or second degree, it is necessary to refer to and consider the provisions of the statute by which the distinction between the first and second degree of murder is created. The statute declares ' that all murder which shall be perpetrated by means of poison, or by lying in wait, or by duress of imprisonment or confinement, or by starving, or by malicious, willful and excessive whipping, beating or other cruel torture, *or by*

*any other kind of willful, deliberate or premeditated killing,* or which shall be committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, shall henceforth be deemed murder in the first degree. And all other kinds of murder shall be deemed murder in the second degree.'

"The counsel for the prisoner has supposed, and argued with great ability and ingenuity (as he always does) in support of his supposition, that the words "any other kind of willful, deliberate or premeditated killing" ought to be construed, and of necessity, as referring to the character or kind of killing or murder specified in the previous enumeration, (by means of poison, lying in wait, duress of imprisonment or confinement, starving, willful, malicious or excessive whipping, beating or other cruel torture) as if it read "any other kind of *such* willful, deliberate or premeditated killing ;" because otherwise, as he supposes, the preceding particular enumeration would be useless. Now a plain and invincible answer to this argument is presented in the import of the terms used—*other* and *such*. *Other killing* means any other whatever, which is different from the *same; such killing* would refer to the modes of killing enumerated, and confine itself to the kind of killing enumerated and the means by which it was effected. To admit this construction of the prisoner's counsel would be to allow that the Legislature meant nothing, or did not understand what it meant, when it used, upon this very important subject of life and death, those words of plain and obvious import: "Any other kind of willful, deliberate and premeditated killing." This is what this Court cannot admit. * * "In all these enumerated cases, the Legislature has declared the law, that the perpetrator shall be guilty of murder in the first degree *without further proof* that *the death* was the ultimate result, which the will, deliberation and premeditation of the party accused sought. And the same authority has declared the law that any other kind of killing which is sought by the will, deliberation and premeditation of the party accused, shall also be murder in the first degree ; but that as to this kind of killing, proof must be adduced to satisfy the mind that the death of the party slain was the ultimate result which the concurring will, deliberation and premeditation of the party accused sought. But to this general rule the

same authority adds an exception, which is that any death consequent upon the perpetration, or attempt to perpetrate, any arson, rape, robbery or burglary, shall be deemed murder in the first degree, and all other murder, at common law, shall be deemed murder in the second degree. So that the cases within the exception, as now put, and the cases enumerated, as first mentioned, are, in fact, placed upon the same principle; there is no necessity of proof in either to establish the fact that a homicide was intended. And it follows, of course, that all other homicide which was murder at common law is now murder in the second degree, except when it shall be proved that the homicide was the result of a " willful, deliberate and premeditated killing;" and it also follows, of necessity, that when by the proof the mind is satisfied that the killing was willful, deliberate and premeditated, such killing must be taken and held to be murder in the first degree. This construction of the act of Assembly is consistent with, and supported by the decisions of this Court in *Burgess' case*, (2 Virg. Ca. 483) and *Whiteford's case* (6 Rand. 721)."

In *State* v. *Dunn* (18 Missouri, 423) the same question is considered. The Court say: " The common law implied malice in every unlawful killing, and the burden of proof of extenuating circumstances, unless they arose out of the evidence against the defendant, lay on him. Our act, defining murder in the first degree, is a transcript of the act of 1794 of the State of Pennsylvania. Under that statute it has been held, that unless the circumstances of malice are proved, the law will presume the unlawful killing murder of the second degree. Under the act, the unlawful killing is presumed to be murder, but not murder in the first degree. Whenever it appears from the whole evidence that the crime was, at the moment, deliberately or intentionally executed, the killing is murder in the first degree; as if one, without uttering a word, should strike another on the head with an ax, this would be deemed premeditated violence within our act; it will constitute the offense, if the circumstances of willfulness and deliberation were proven, although they arose and were generated at the period of the transaction. If the party killing had time to think, and did intend to kill, for a minute as well as an hour or a day, it is a deliberate, will-

ful and premeditated killing, constituting murder in the first degree. So that under the statute, there is no foundation for the notion that the crime must have been preconceived some time before its perpetration." The same doctrine is affirmed in the same Court in *State* v. *Jennings* (Id. 443).

In the *People* v. *Moore* (8 Cal. 90) this Court holds that any kind of unlawful, willful and deliberate killing is murder in the first degree.

We have given these extracts and gone at such length into this question, because of its practical importance, and in order that the doctrine may be definitely settled, and be capable of easy comprehension. The whole question may be thus stated : Murder in the first degree consists of a willful, premeditated, unlawful killing; the intent to kill must exist; this intent may be inferred from the circumstances, as the use of a weapon calculated to produce death; this intent need not have existed for any given length of time before the fatal blow; it is sufficient, the killing being unjustified or unexcused by the circumstances, that the intent to kill, if it be formed, be on the instant of killing or doing the act from which the death ensued. In the cases where the killing was done in the perpetration of the felonies, or the attempt to perpetrate the felonies mentioned in the statute, murder in the first degree may be committed, though no intent existed to kill at the time of the fatal blow, as if the criminal shot at the deceased for the purpose of disabling him, or the like.

We see nothing in the other errors assigned for which the judgment should be reversed. Error must be made affirmatively to appear. The mere fact that it is stated generally that the prisoner was absent during a portion of the trial is not enough. Various circumstances might have rendered this absence necessary. It is not shown when, or for what time, or at what part of the proceedings the prisoner was absent. It may have been for a single moment, in passing out of the court house, as his counsel were arguing the case to the Court or the jury, or as suggested, it might have been when the Court was fixing the day for sentence; and to this idea the record affords some countenance. But in the absence of a statement of the facts, we are unwilling to hold that this general averment is sufficient to justify a reversal of the judgment.

The last point is, that the Court excluded some hearsay testimony, after having admitted it. We see no error in this. The evidence was plainly inadmissible. The prisoner should not have been surprised at this ruling. At least, on the charge of the Court, he should have applied for leave to introduce other testimony if he really relied on this sort of proof to establish the point in controversy. Besides, on the motion for a new trial, no affidavit was tendered of the witness by whom he could, as he alleges, have established the fact, and no excuse shown why it could not be obtained.

Our conclusion is, that there is no reversible error in the record.

Judgment affirmed, and the Court will appoint a day to carry its sentence into effect.

On petition for rehearing, BALDWIN, J. delivered the opinion of the Court—COPE, J. concurring.

Rehearing denied. The statute (Wood's Dig. 294, sec. 320) does not say that the *trial* must necessarily be had, during its whole progress, and in every part of it, in the presence of the defendant. The words are: " If the indictment be for a misdemeanor, the trial may be had in the absence of the defendant; but if for a felony, he must be personally present." We must presume in favor of the regularity of the action of the inferior Court. No statement of facts in connection with this subject is made. The bare fact is noted that the defendant was absent during a portion of the trial. This loose statement, which the Judge should not have made except in connection with the real facts illustrating and explaining it, is all that the record gives us upon this subject. This fact does not *necessarily* show error injurious to the party, or any error at all. We showed in the opinion that various allowable causes might exist for the momentary absence of the prisoner; and we are to presume from the fact that the prisoner has not explained the facts connected with this statement, that his absence, as stated, was one of these. We are not aware that we have ever decided anything which contravenes the rule now held; and if we had, in this class of cases we should not hesitate to overrule the decision, for upon a mere technical question of imputed irregularity in the

Green *v.* Prettyman.

trial or conduct of a cause, whenever the fact, as stated, may be consistent with the duty of the Court, we think that we should hold that the Court acted properly, when nothing is shown which goes to establish a contrary theory.