# THE PEOPLE OF THE TERRITORY OF UTAH,
## RESPONDENT, v. ANDREW CALTON, APPELLANT.

REVERSED, CALTON v. UTAH, 130 U. S. 83.

CRIMINAL LAW—HOMICIDE—MURDER IN FIRST DEGREE.—Evidence given in the case examined and held to justify a verdict of murder in the first degree as showing premeditation and design.

ID.—ID.—MANSLAUGHTER.—An instruction that "to reduce homicide to the degree of manslaughter on the ground solely that it was committed in the heat of passion, the provocation must have been considerable; in other words such as was calculated to give rise to irresistible passion in the mind of a reasonable person; no slight or trivial provocation, such as is not calculated to engender uncontrollable passion in any ordinary man, will suffice," correctly stated the law.

ID.—ID.—INSANITY AS A DEFENCE.—An instruction that "when insanity is relied upon as a defense to a criminal charge, the burden is upon the defendant to establish it, unless the evidence on the part of the prosecution tends to establish it. The test of responsibility for a criminal act, when unsoundness of mind is set up as a defense, is the capacity of the defendant to distinguish between right and wrong at the time and with respect to the act which is the subject of inquiry," correctly stated the law.

ID.—INTOXICATION.—The court in instructing the jury characterized
drunkenness as "gross vice and misconduct," without applying the
language to the defendant; *held*, not to be error.

ID.—PRIVATE COUNSEL.—Where it appeared that private counsel had
assisted the prosecution, and had closed the argument to the
jury; *held*, that under section 257 of Code of Criminal Proced.
this was not error.

ID.—SENTENCE.—CLERICAL ERROR.—Where record shows that defend-
ant was sentenced to be publicly executed, the court below
having authority to correct such clerical error, it is not ground
for reversal.

APPEAL from a judgment of the district court of the
second district, and from an order refusing a new trial. The
opinion states the facts.

*Mr. Presley Denney* and *Mr. J. W. Christian*, for ap-
pellant.

*Mr. George S. Peters* and *Mr. W. H. Dickson*, for re-
spondent.

ZANE C. J.:

At the September term of the district court of the second
judicial district, the appellant was found guilty by a jury
of the crime of murder in the first degree. A motion for
a new trial having been submitted and overruled, and the
defendant, as was his legal right, having elected shooting
as the mode of punishment, the court sentenced him to be
shot on the 26th day of November, 1887. From that judg-
ment he has appealed to this court.

The first ground of reversal relied upon by the defend-
ant, in the order we will consider the errors assigned, is
that the evidence was insufficient to authorize the verdict.
It appears from the evidence given on the trial that the
deceased, Michael Cullen, and the appellant, Andrew Cal-
ton, and one Jerry Tiberty were acquaintances, and were
residents of Star mining district, in the Territory of Utah;
that about 10 o'clock of the morning of July 14, 1887, these
men met a few miles away in the town of Milford, the two
last named having gone there together. Tiberty testified
to this effect: When they alighted, Michael Cullen came
up, and they went into a saloon and drank with him.

That during the day they drank together five or six times. Once or twice they had beer; the other times, whisky. It appears that they started home about 6 o'clock in the evening of the same day, Calton and Cullen sitting on the wagon seat, and Tiberty lying on some ore-sacks behind them; that Calton was driving, and Cullen sitting to his left. Tiberty testified, further: Soon after they had started, they all took a drink out of a bottle, and after they had crossed the railroad Calton's whip-lash dropped off, and he (witness) left the bottle on the sacks, and jumped out to get the lash. While he was tying it on, Cullen asked for a drink, and witness told him he could get it if he would turn around. Cullen did so, but witness did not see whether they drank or not. He himself was busy with the whip, and when he looked up he said, "You are fine fellows to drink without offering me any." Calton answered, "Mike has it," and said to Cullen, "Give Jerry a drink; it is his whisky." Cullen had the bottle under his arm, and Calton reached over and took hold of the neck of it, and held on, and in the struggle that ensued some of the whisky was spilled; and witness, seeing that Cullen was not willing to give it up, said, "Damn the whisky; I do not want it," and then said, "Drive on," walking ahead a few steps, thinking they would follow. Calton got the bottle, and held it up, saying, "Come back. Here it is; I have it." Witness then went back, and got it, and put it in his side pocket, and again said, "Drive on. I will walk. You may not get any more on the way." After taking a few steps, he looked around, and Calton rose straight up in the wagon, and the two men had their hands on each other's necks. He then ran back, and put his foot on the hub of the front near wheel to get up and separate them, and get in behind the seat. Calton was then leaning over the dash-board. Cullen was in his seat, and did not rise from it, so far as witness saw. Witness then said: "What are you quarreling about—two friends quarreling for nothing. You ought to be ashamed of yourselves." Witness then tried to coax them to let go, and finally said to them that he would put them out if they did not. He tried for a couple of minutes to separate them. Cullen

had his hand up, and said: "You will choke, will you, you
s—n of a b—h?" and was going to strike Calton. Witness
ran his arm between them, and "saved him from the
balance." Calton then said, "Let's quit," and they both let
go. Cullen was then in the seat, and had not gotten out of
it. Calton then picked up a bundle, and jumped out of
the wagon, alighting upon his feet. The team started,
and witness jumped from the wheel, and, after a little
time, with difficulty, got hold of the bridle of the near
horse (his hands being crippled). He then heard Calton
say, "You will abuse me," or "You will choke, you s—n of
a b—h," and, turning around, he saw Calton take his pistol
out of the bundle he carried. Calton said, after he got
out: "I don't give a damn if you are Matt Cullen's brother;
you cannot abuse me." Cullen was sitting in the seat, and
it was not a half second after he saw the pistol until the
first shot was fired. Calton kept on firing. Witness
halloed, "I say, for Christ's sake, quit that." Calton an-
swered, "Oh, he is dead; the first shot killed him, and I
might as well give him the rest." Witness said, "No, he
is not dead," and he kept on firing, and witness kept
saying, "Quit that; he is not dead." Afterwards, when
they were coming down to Milford, witness said, "The
second or third shot missed fire." Calton then said it
was the second. After the shooting, witness said, "Well,
we must go back to Milford." Calton answered, "Yes."
The witness had dropped his hat when he caught the
horses, and Calton picked it up, and witness picked up
Calton's, and handed it to him. Witness said to Calton,
just as they turned around, that he wished that he had let
the horses go, and had tried to grab him, and Calton an-
swered that it was no use; he would have got him any-
way. Calton drove back to Milford; the body remaining
on the seat by Calton, witness holding it there. As they
were going back, witness said he was sorry, and Calton
replied that he was sorry too; that he did not pack that
gun for Cullen, and he wished it had been Dan Mackintosh.
Just outside the town he asked where they should drive,
and witness told him. After they reached Milford, Calton
said on two or three occasions, when men shook hands

with him, that he did not think they would shake hands with a murderer, and said to the witness, "My life is not worth one cent to me now."    Witness McKean testified he saw the three men going out.    Tiberty appeared to be sober.    When they came back, Calton said he shot him, and shot him after he was dead.    Calton told witness that the pistol was in its scabbard, and witness got it.    Its caliber was 44 or 45.    Dr. Fowler made a post mortem examination, and testified that there were nine bullet wounds on the person of the deceased.    Four were probably made by one bullet, and three might have been made with another.    They were fatal.    Witness Baldwin testified that Calton said he shot Cullen because he was choking him; that he shot him in self-defense.    Calton also said to one Hague: "Here is your partner.    I killed him, and I killed him good."    Calton and Tiberty acted as if they were drunk.    Calton had some scars on his face and neck. Witness Moore testified that Calton said he killed him the first shot, and thought he would put the balance of the shots in him, and was forced to kill him; that he thought Calton was then intoxicated.    A. M. Stoddard testified that Calton said he had been insulted, and bought a pistol with the intention of killing the next man who insulted him; and witness said, "I suppose you have done so now," and Calton replied, "Yes."    A. J. Lewis testified that he had known Calton four years; that he had the reputation of being a very quiet man, sometimes not speaking to any one for two or three days; that witness thought that he was crazy; and that Calton received ordinary wages as a miner.    O. S. Carver testified that he had known defendant eight or nine years, and that he was always considered a peaceable and quiet citizen.    Mr. Burnison also said that defendant had the reputation of being a peaceable and quiet man.    There was evidence that Calton had armed himself with a pistol on another occasion, and had made threats of violence; but there was no evidence to show that there had ever been any unfriendly feeling between him and the deceased before the fatal occasion.    On the contrary, there was evidence to show that they had been on friendly terms.

Owing to the nature of the case, and of the alleged condition of the three men, and the alleged want of capacity of the appellant, we thought it necessary to state the evidence thus fully. This evidence proves to a moral certainty that the appellant caused the death of the deceased by a pistol shot, and that the killing was not excusable or justifiable. The further question remains, did the appellant inflict the fatal wound with such a deliberate and premeditated intention to take the life of Cullen as authorized the jury to find him guilty of murder in the first degree? It appears from the evidence that while the appellant and the deceased were engaged in an angry altercation in the wagon, attended with personal violence, when remonstrated with by the witness Tiberty, the appellant said, "Let's quit," and that the struggle then ceased. That thereupon the appellant got the bundle in which the pistol was, and jumped out of the wagon upon the ground, and saying, "You will abuse me," or "You will choke, you s—n of a b—ch," took his pistol out of the bundle, and cursing the deceased, "I don't give a damn if you are Matt Cullen's brother; you cannot abuse me," he said, and fired the deadly shot while Cullen was sitting upon the seat; and when Tiberty halloed to him to quit, he said, "Oh, he is dead; the first shot killed him, and I might as well give him the rest;" and when told that Cullen was not dead, kept on firing in spite of the remonstrance of Tiberty; and afterwards, when told that the second or third shot missed, replied that it was the second. The reasonable inference from the language and conduct of the appellant is that he formed the design of taking Cullen's life before he jumped out of the wagon; and he then commenced preparing to execute his purpose by getting the bundle in which the pistol was, by getting into a position in jumping out of the wagon, by getting his weapon, in taking it out of the bundle and out of the scabbard, by leveling the pistol at the vitals of the deceased, and by firing the deadly shots. Such preparation indicates unmistakably thought and design. It shows premeditation; a definite intention to take the life of Cullen. The means he used, the acts he performed, were suited to the result—the death of the de-

ceased. He understood the means that he used, and antici-
pated the effect.

Section 1917, Comp. Laws Utah 1876, gives, in substance,
the common-law definition of murder, viz.: "Murder is
the unlawful killing of a human being with malice afore-
thought;" and section 1918 defines malice essential to mur-
der: "Such malice may be express or implied. It is ex-
press when there is manifested a deliberate intention un-
lawfully to take away the life of a fellow-creature; it is im-
plied when no considerable provocation appears, or when
the circumstances attending the killing show an abandoned
or malignant heart." Section 1919 makes the distinction
between murder in the first and in the second degree:
"Every murder perpetrated by poisoning, lying in wait, or
any other kind of wilful, deliberate, malicious, and pre-
meditated killing; or committed in the perpetration of or at-
tempt to perpetrate any arson, rape, burglary, or robbery;
or perpetrated from a premeditated design unlawfully and
maliciously to effect the death of any other human being,
other than him who is killed; or perpetrated by any act
greatly dangerous to the lives of others, and evidencing a
depraved mind, regardless of human life, is murder in the
first degree; and any other homicide committed under such
circumstances as would have constituted murder at com-
mon law is murder in the second degree." Section 1921
defines manslaughter: "Manslaughter is the unlawful
killing of a human being without malice. It is of two
kinds: *First*, voluntary, upon a sudden quarrel or heat of
passion; *second*, involuntary, in the commission of an un-
lawful act not amounting to felony, or in the commission
of a lawful act which might produce death in an unlawful
manner, or without due caution and circumspection."
While the killing shown by the evidence in the case was
immediately after an angry quarrel and a violent alterca-
tion, attended with heat of passion, it cannot be said that
it was not in pursuance of a specific and distinctly formed
intention to take the life of the deceased. There being an
intention to kill, and no provocation to justify or excuse it,
the killing must have been malicious, unless the passion
was so great that the intent resulted from it, and the in-

tention was without thought, and the act of killing proceeded from the passion alone, or so nearly alone that the passion could be said to be the controlling source or author. The unlawful killing of a human being with malice aforethought was murder at common law. Section 1919 above quoted describes two classes of murder, and distinguishes one as murder in the first degree, and the other as murder in the second degree. And, again, it distinguishes certain kinds of homicides as murder in the first degree, by the act, the intent, the object, and the circumstances, or by one or more of these. It describes one kind of murder in the first degree by the measure alone,— the amount of the deliberation which precedes it. The intent essential to murder is the state of mind—the intention at the time of the act that causes death. The law does not require deliberation after the intent, and before the act of killing. It does require that the man shall be able and have an opportunity to think about the killing, that he may deliberate and meditate upon it; and whenever the deliberation is sufficient to form therefrom a specific and well-defined intention to kill the person afterwards slain, it is enough to characterize the killing as murder in the first degree. On the contrary, if the action of the mind is so impeded and hindered by passion, intoxication, or other sufficient cause that it cannot, during the time intervening, sufficiently think and deliberate upon the act and its consequences as to be able to form a distinct and perfect intention in the light of thought and reason, the premeditation is not sufficient to characterize the crime as murder in the first degree. No man, who had not the capacity or was not free to think and reason about the act, and who had not adequate opportunity to form a distinct and definite intention in the light thereof, ought to be deprived of his life for an act flowing from such an intention. As a general rule, the law disregards acts and their consequences that do not follow intentions; therefore an individual is not bound by an act as to which he had no opportunity or capacity to form an intention. And, with respect to the crime of murder, the want of deliberation and premeditation palliates the crime to murder in the second de-

gree, though the killing was intentional and malicious. When the act of killing does not proceed from a malicious intention, but does proceed from passion, or is the result of negligence, the crime is reduced to manslaughter. The law abates and yields so much on account of human infirmities.

We are of the opinion that the evidence authorized the jury to find that the appellant, with the capacity and opportunity to reason, and with premeditation, formed a specific and distinct intention to take the life of Cullen, and, therefore, to find him guilty of murder in the first degree. The proposition of law that homicide is murder in the first degree when the person killing had the opportunity and the capacity to deliberate upon the act, and to form a specific and distinct intention from such deliberation, is supported by the following authority: 2 Bish. Crim. Law, sec. 728; *Keenan* v. *Com.* 44 Pa. St., 55; 2 Whart. Crim. Law, secs. 1084–1106; *People* v. *Bealoba,* 17 Cal., 389; *State* v. *Williams,* 43 Cal., 344.

The appellant excepts to the following portion of the charge of the court to the jury, and assigns the giving thereof as error: "To reduce homicide to the degree of manslaughter on the ground solely that it was committed in the heat of passion, the provocation must have been considerable; in other words, such as was calculated to give rise to irresistible passion in the mind of a reasonable person. No slight or trivial provocation, such as is not calculated to engender uncontrollable passion in any ordinary man, will suffice." Counsel for the appellant contend that such provocation as would be calculated to cause irresistible passion in an ordinary—a reasonable—man is not necessary to reduce homicide that would be murder to manslaughter. The law, in selecting a human standard by which to measure human conduct, selects an ordinary, not an extraordinary man; a reasonable, not an unreasonable, man. For the law is based upon reason. It selects reasonable standards. It selects such a provocation as the reason of such a man would not be likely to control; in other words, not such a provocation as would be calculated to awaken a passion that the reason of an ordinary man would be likely

to resist. Assuming (as we must, in the absence of proof of insanity or imbecility) that the appellant was a man of ordinary capacity, he should have controlled such passion as a reasonable man could restrain, and would be likely to restrain. It is very difficult, in many cases, to distinguish manslaughter from murder. The act that caused death may have been wilful, but death may not have been intended. The intention to kill may have been formed, and life taken, during or soon after an angry quarrel, or amid or immediately after violence and excitement. In order to determine whether the accused in any given case acted from reason or passion, the provocation, the weapon used, (if any,) the preparation for the act, his expressions, and all the circumstances must be considered; and although it appears that the act proceeded to some extent from malice, upon reflection and calculation, and to some extent from passion, that will be held to be the cause which had the preponderating influence. Passion, to some extent, almost always influences the slayer, when the fatal wound is given during or soon after a quarrel or a fight; and, conversely, malice, to some extent, influences the party killing in either case. But the law charges the act to malice or passion as the one or the other is found to be the preponderating cause of the act. In ascertaining this fact, as all others, in criminal cases, the jury must give the accused the benefit of "any reasonable doubt." The passion must be such as is sometimes called "irresistible;" yet it is too strong to say that the reason of the party should be dethroned, or he should act in a whirlwind of passion. There must be sudden passion, upon reasonable provocation, to negative the idea of malice; and the passion must proceed from what the law accepts as adequate cause; else it will not reduce the felonious killing to manslaughter. 2 Bish. Crim. Law. sec. 697. We find no error in giving the portion of the charge above quoted.

The defendant also alleges as error the statement to the jury of the following principle of law: "When insanity is relied upon as a defense to a criminal charge, the burden is upon the defendant to establish it, unless the evidence on the part of the prosecution tends to establish it.

The test of responsibility for a criminal act, when unsoundness of mind is set up as a defense, is the capacity of the defendant to distinguish between right and wrong at the time of and with respect to the act which is the subject of inquiry." The law presumes that the mind is in its normal condition until some evidence of unsoundness or imbecility appears. We understand that the capacity of a person accused of crime to determine whether the criminal act was right or wrong is the correct test of responsibility. If a man, with ability to refuse, kills another with the knowledge that it is wrong, he is responsible to the law for the act. We are of the opinion that this exception is not well taken.

The court, in substance, stated to the jury that the law will not permit a person who commits a crime while intoxicated to avail himself of his own "gross vice and misconduct" as a justification therefor. Appellant excepted to the use of the terms, "his own gross vice and misconduct," and assigns the same as error. This was a statement of the law with respect to an hypothetical case. In it the court did not say, as counsel urged that he did, that the appellant had such a gross vice, or that he had been guilty of such misconduct. The court characterized drunkenness as a gross vice and as misconduct. The court informed the jury that drunkenness, if proven, might be taken into consideration in determining whether the homicide was willful and premeditated; and that the weight to be given to such fact, if found, was for the jury; and that they should receive evidence thereof with caution, and carefully consider it, in connection with all the evidence in the case. The jury were told to carefully consider the evidence of drunkenness, with all the other evidence. In this we find no error.

The court permitted W. H. Dickson, private counsel, to aid the assistant district attorney in the prosecution of the defendant. This action of the court the defendant assigns as error. Counsel for appellant refer to subdivisions 2, 5, and 6, sec. 257, Crim. Code, Laws Utah 1878: "The prosecuting attorney, or other counsel for the people, must open the cause, and offer the evidence in support of the indict-

ment. . . . When the evidence is concluded, unless the case is submitted to the jury on either side, or on both sides, without argument, the prosecuting attorney, or other counsel for the people, must open, and the prosecuting attorney may conclude, the argument." As we construe the foregoing provisions, they do not deprive the court of the discretion to permit private counsel to aid the public prosecutor. The prosecuting attorney, or other counsel for the people, are mentioned in the provisions quoted, except in connection with the closing sentence, and it is there stated that the prosecuting attorney may conclude the argument. It would be unreasonable to assume that the legislature, in the use of this language in the connection in which it appears, intended to deprive the court of the discretion to permit counsel other than the public prosecutor to close the argument. The court should so control the argument as to prevent anything improper—any unfairness or injustice to the accused. This point was expressly decided in the case of *People* v. *Tidwell*, 4 Utah.

The appellant also asks for a reversal for the reason, as alleged, that he did not have sufficient time to prepare for trial. The homicide occurred on the 14th day of July, 1887. The indictment was found on the 9th day of the following September. The appellant was arraigned and counsel appointed to defend him, on the day following. On the 14th day of the same month he pleaded not guilty. A jury was impaneled on the 21st, and on the 24th of the same month returned a verdict of guilty. It does not appear that the defendant asked for further time to prepare for trial, or that other material evidence could have been produced if the trial had been postponed. The reason urged constitutes no sufficient ground for a reversal.

In the argument, counsel suggested that the record shows that the appellant was sentenced to be executed publicly. The use of the word "public," in connection with the execution, being a clerical error, the court below possesses the undoubted authority to correct the judgment in that respect. We do not regard it as a ground for a reversal.

We find no error in this record sufficient to authorize a reversal. The judgment of the court below is affirmed.

BOREMAN, J., concurred.

HENDERSON, J., dissenting.

I do not concur in affirming the conviction in this case. The defendant was convicted of murder in the first degree, without recommendation to mercy, and sentenced to death. The record shows that the prisoner was represented in his defense by counsel appointed by the court. After conviction, a statement was made, on motion for a new trial, embodying a full transcript of the proceedings on the trial, from which it appears that Charles W. Zane, assistant district attorney, and William H. Dickson, counsel, appeared for the people. The record shows that Mr. Dickson examined and cross-examined all the witnesses; indeed, that he conducted the entire case for the people, except that Mr. Zane, at the conclusion of the evidence, opened the argument to the jury for the prosecution, and that Mr. Dickson closed the argument. All this is shown in the record in detail, and nothing whatever is shown or stated as to how or in what manner Mr. Dickson became connected with the case, or that there was any reason shown for his appearance, or for allowing him to close the argument, instead of the assistant district attorney, or that the attention of the court was called to it in any manner, or that any objection was made to it. Indeed, there is nothing said about it, except a detailed statement of the facts. The statute provides (subdivision 5, sec. 257, p. 115, Crim. Proc. Act 1878) as follows: "When the evidence is concluded, unless the case is submitted to the jury on either side, or on both sides, without argument, the prosecuting attorney, or other counsel for the people, must open, and the prosecuting attorney may conclude, the argument." By the next section it is provided: "When the state of the pleadings requires it, or in any other case for good reasons, and in the sound discretion of the court, the order of argument prescribed in the last section may be departed from." By what is known as the "Poland Act," the district attorney has charge and control of all prosecutions under the laws of the territory; so, it stands just as though the district attorney was named

in the statute above quoted, instead of the prosecuting attorney. It will be seen that the record shows that in this case there was done just what the statute says shall not be done except for good reasons shown, and in the sound discretion of the court. The people were represented by an assistant district attorney of ability and experience, and the other counsel that appeared for the people was not the district attorney, and is not an assistant. Of all this, this court has judicial knowledge, as the laws of Congress (section 2 of the Poland act of 1874; Comp. Laws 52) provide that the district attorney or his assistants shall perform the duties of prosecuting officers under the laws of the territory, and also provides that the appointments and oaths of office of such assistants shall be filed in this court. It is argued in support of the conviction, that this question is not available to the prisoner, because the record is silent upon the subject, and therefore the presumption is that good cause was shown. I do not concur in this view. After this conviction and sentence, this record was made up, and, as before stated, states the facts in detail; the stenographer's notes, fully transcribed, being a part of the record. The statute says that the prosecuting attorney may conclude the argument. The statute has carefully and definitely prescribed the order of the argument, and provided that, when other counsel than the prosecuting attorney appear for the people, they may open the argument, but shall not close it, unless, upon cause shown, the court in its sound discretion permits it. In order to change this order of argument, some cause must be shown. The sound discretion of the court is required to be exercised. The assistant district attorney was there; and if a showing was made, and the judgment of the court was taken upon it, I think the record should show it; and that if it does not, in a capital case, we ought not to indulge in any presumption that it was done. We are referred to the case of *People* v. *Strong*, 46 Cal., 302. In that case the court held, under a statute like ours, that it is improper to allow other counsel than the prosecuting attorney to close the argument, without good cause shown; but they say that it

is to be presumed that it was shown, unless the contrary appears. That was a case of larceny. The report of the case upon this branch is very meager. As to whether counsel for the defendant appeared for him by order of the court, or in the ordinary way, on his own employment, is not stated. It does appear, however, that counsel for the prisoner objected to the closing of the argument by other counsel than the prosecuting attorney, and that the court overruled him. It therefore does affirmatively appear that the judgment of the court was called into action upon the subject, and the court only decided that they would not undertake to say that there was no evidence or showing to support the ruling of the court when the record is silent upon that subject, but does show the ruling. In the case at bar there is nothing to show that the court was called upon in any way to exercise its judgment. It is urged that, as no objection was made in the court below, the prisoner cannot now have the benefit of it. The prisoner was not represented by counsel employed by himself. The court appointed counsel to conduct the defense, and, through one of its officers, undertook to conduct his defense for him. It is true that the counsel who appeared in this case is of unimpeachable integrity and great ability, but this does not, in my judgment, alter the case. Indeed, to have such counsel close the argument when employed by private parties would be more dangerous to the defendant than counsel of less ability. I think where the charge is murder in the first degree, and the people are represented by the assistant district attorney on the trial, and the prisoner is defended by counsel appointed by the court, and, after conviction and sentence to death, a statement is made on motion for new trial, embodying a detailed statement of the evidence and proceedings on the trial, and it appears from such statement that other counsel than the district attorney appeared, conducted the prosecution, and closed the argument to the jury, the record ought to show why the statutory rule was departed from, and, if no reason for it appears, that this court ought not to indulge in any presumptions against the prisoner in relation to it.

Again, the statute (section 1920, Comp. Laws 1876, p. 586) provides: "Every person guilty of murder in the first degree shall suffer death, or, upon recommendation of the jury, may be imprisoned at hard labor in the penitentiary for life, at the discretion of the court." . . . It will be seen by this statute that, in a measure, the jury fix the punishment in cases of murder in the first degree. Without this recommendation, the court has no discretion in the matter whatever but to fix the day of execution. In this case the attention of the jury was not called to this statute, nor were they instructed in relation to it. The charge is given in full, and incidental remarks of the court during the trial, but nowhere is this statute called to the attention of the jury. Several sections of the statute were read to the jury in the charge of the court, and some that are found on the same page with this one. I think the attention of the jury ought to have been called to this statute, and they instructed in relation to it; and that for this reason the conviction ought to be set aside, and a new trial ordered. The prisoner was deprived of a substantial right. The determination of the question as to whether he should suffer death or imprisonment was one of vital consequence to him. The jury, to whom the statute commits the determination of that question, at least in part, were not informed of their duty and responsibility in the matter, so as to require them to exercise their judgment and discretion in relation to it, and by the verdict they rendered the court had none.

This record, at least to my mind, shows that the verdict and judgment is a harsh one. The homicide occurred when all the parties were more or less intoxicated. It was in a difficulty then immediately springing up between them over a most trivial matter, and proceeding at once to blows, and from blows to the homicide; the deceased and the prisoner being friends up to that time. From the time when the difficulty first arose to the time of the homicide could not have been more than 10 minutes, and perhaps not more than half that time. If speculations and presumptions are to be indulged in, the one most reasonable to my mind is that the secret of the

harsh verdict and judgment in this case is found in the matters before stated.

I think the judgment should be reversed, and a new trial ordered.