[Crim. No. 404.  Third Appellate District.—March 4, 1918.]

## THE PEOPLE, Respondent, v. ROBERT W. SHAW, Appellant.

CRIMINAL LAW—ASSAULT WITH INTENT TO MURDER—EVIDENCE—EXPLA-
NATION OF TESTIMONY—MENTAL CONDITION OF VICTIM.—In a prose-
cution for the crime of assault with intent to commit murder, where
the effect of the assault, according to the testimony of experts, was
to produce an impairment of the mind and to cause the assaulted
party to accept the statement of others as the product of his own
recollection of the events, and it developed on his cross-examination
that before the grand jury he attempted to give some details of
the assault, which he could not recall at the trial, it was proper to
ask him on redirect examination how he came to give such testi-
mony, and also to question the assistant district attorney as to
conversations which he had had with the injured party, and how his
statements corresponded with defendant's explanation of the affair.

APPEAL from a judgment of the Superior Court of
Shasta County.  James G. Estep, Judge.

The facts are stated in the opinion of the court.

M. G. Gill, and Dean & Carter, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones,
Deputy Attorney-General, for Respondent.

BURNETT, J.—The defendant was convicted of the crime
of assault with intent to commit murder.  The evidence was
ample to justify the verdict.  Indeed, a careful examination
of the entire record can hardly fail to produce the conviction
that the assault was the result of a deliberate, premeditated,
and brutal design on the part of appellant to take the life of
his victim.  The offense was committed in the afternoon of
December 26, 1916, near the cabin of defendant and about
three and one-half miles from the town of Shasta.  In the
forenoon of that day, in said town, appellant had an acri-
monious controversy with one T. L. Cockrum, who was about
to go with a horse and buggy to deliver some groceries to a
party at the Mount Shasta mine, some distance beyond said
cabin.  Appellant requested Cockrum to take some supplies
to one Charles Paige.  This Cockrum refused to do for the

reason that he disliked Paige. The discussion which ensued developed a good deal of heat, and each became abusive and truculent. The defendant repaired to an adjoining saloon, where he drank some liquor and made inquiries about a gun which he claimed was to have been left there for him. In reply to a question by one of those present, he said he expected to kill a couple of men and that he himself might be one of them, but he did not specifically mention any other. The jury herein were entirely warranted in believing that murder was then rankling in his mind, and that he had formed the intent and was then planning to take the life of Cockrum. There is other evidence which we need not recite, that he had a feeling of resentment and hostility toward the prosecuting witness. Shortly after the occurrence in the town, Cockrum, accompanied a part of the way by one Filmore Davis, drove from Shasta over to the mine, passing the said cabin of Shaw, and after delivering the articles which had been sent, he started back alone between 3 and 4 o'clock in the afternoon.

Shaw, in the company of two other men, walked to his cabin, which appellant entered, the other men going on to some other destination. What occurred between Shaw and Cockrum at the time of the shooting is the subject, as might be expected, of earnest dispute. It is the theory of the people that Cockrum was shot from ambush as he approached Shaw's cabin, the appellant firing, probably, from within the house. Circumstances are not wanting to support this view. There is, however, no direct testimony to that effect. Of the only eye-witnesses, Cockrum testified that he could recall nothing of the occurrence, that his mind was a blank as to what happened after he arrived at a point some seven hundred feet from Shaw's cabin until several weeks thereafter, when he found himself in the county hospital.

The defendant attempted to give the details of the tragedy, seeking to justify himself, but it is apparent that his story is unbelievable, and it would be surprising if the jury had accepted it as of exculpatory significance. In fact, the statement upon its face falls short of any justification for the overt act. He was standing, so he says, near his cabin when Cockrum drove up, renewed the quarrel, drew his pistol, and leveled it upon him. Thereupon he went into the cabin, obtained his *shotgun,* came out, and Cockrum was still standing

at the same place and in the same position, with his pistol
still leveled.   Immediately he fired, as he testified, "to make
him put his gun down and keep his mouth shut," because
"I didn't like to see that thing pointed toward me particu-
larly any more, although a gun never scared me much."
Accepting his statement as true, he was perfectly safe when
he went into the cabin, and he was not warranted in coming
out to shoot Cockrum.

Moreover, there are many circumstances that brand his
story as false and incredible.   The cold record even seems to
compel the conclusion that his pretended self-defense was a
pure fabrication.   The spirit which animated him is not
difficult to discern in the statement which he made to one
Charles Gibson, the first man he saw after the shooting:
"Gibson, I would like to have you come over to my place.
I shot a man all to hell.   I shot that man, Cockrum, in the
head.   I expect he is dead by this time."   Not a word about
self-defense until some time afterward, and then his state-
ment was entirely at variance with his testimony on the stand.
We will not dwell on the subject, beyond saying that his
explanation to different persons was also conflicting with said
testimony.   His conduct in taking the pistol of Cockrum after
the shooting and placing it on the seat of the buggy showed a
disposition to simulate and create the appearance of self-
defense, and his entirely incredible declaration that after such
a wound Cockrum climbed into the buggy, in connection with
other significant facts, must have led the jury to regard him
not only as a cruel man but as a perjured witness.

We are led to believe that his conduct and attitude were
characterized by inexcusable savagery, and we do not hesitate
to say that seldom does a record present such persuasive and
convincing evidence of guilt.

It is hardly necessary to add that there is no merit in the
contention that the intent to kill was not shown.   According
to appellant's testimony he was standing about thirty feet
from Cockrum when the shot was fired.   The full charge
struck the latter in the upper part of the face, destroyed his
eyes, fractured his skull, and penetrated the brain.   The
effect of such a blow, according to the testimony of experts,
is to cause immediate and total unconsciousness, with the
suspension of all the functions of the body except those of
an elementary and essential character, such as respiration and

pulsation. It produced instantaneously a complete relaxation of the muscular system and utter helplessness. Such a wound deliberately inflicted carried with it the implication that the perpetrator intended to kill the victim. Indeed, it is passing strange that Cockrum survived. That he lived was due, no doubt, to a vigorous constitution and to careful and skillful treatment. We may add that nowhere did Shaw deny that he intended to kill Cockrum, and his actions show clearly enough that he had such purpose.

There is no more merit in the claim that the cause should be reversed for the reason that the court did not specifically instruct the jury that they must find that the defendant had the intent to kill Cockrum in order to convict him of the crime charged. As to this, it may be said that if the defendant desired such instruction he should have requested it. Moreover, this very condition was covered by the instructions given. There was a general instruction that the plea of not guilty put in issue every material allegation of the indictment, and that the burden was upon the prosecution to prove these allegations to justify a verdict of guilty. Again, the jury was told: "The court further instructs the jury that if you believe from the evidence beyond a reasonable doubt that the defendant committed an assault upon the person of T. L. Cockrum with a deadly weapon as charged in the indictment, but without any specific intent to kill and murder the said T. L. Cockrum, then you should find the defendant guilty of assault with a deadly weapon," and also, if they believed that the defendant "committed an assault upon the person of T. L. Cockrum with a deadly weapon as charged in the indictment, with intent to kill and murder said T. L. Cockrum, and that such assault was not committed in the necessary self-defense of the defendant, then you should find the defendant guilty of an assault with a deadly weapon with intent to commit murder as charged." From the foregoing the jury would necessarily conclude that they could not find the defendant guilty of the higher offense unless they were convinced that he had the intent to kill Cockrum.

The only other point made in the opening brief of appellant—and the only one at all of any merit—is that the court erred in overruling objection to certain questions asked of the assistant district attorney and of Cockrum on his redirect examination. The questions propounded of the former

called for the conversations which he had with Cockrum concerning the tragedy, and, particularly, how the latter's statements corresponded with Shaw's explanation of the affair, and, also, when the assistant district attorney noticed a change in Cockrum's account of the occurrences of that day.

The inquiry of Cockrum was as to whom he had stated he made a mistake in his testimony before the grand jury, and as to his sending for certain persons to inform them that he had made such a mistake. This examination grew out of the fact that on the cross-examination of Cockrum it developed that before the grand jury he attempted to give some of the details of the shooting, and here at the trial he declared, as we have seen, that he could not recall any of the incidents.

Appellant in support of his contention invokes the general rule, as thus stated in *People* v. *Turner,* 1 Cal. App. 420, [82 Pac. 397]: "Impeachment of a witness by showing that he has made statements in conflict with his present testimony cannot be met by the party calling such witness with evidence that at other and different times the impeached witness has made statements in harmony with his present testimony, and to permit introduction of testimony of this latter character is prejudicial to the party against whom it is received."

But it may be said that the rule is subject to modifications and exceptions, as pointed out in volume 1, section 492, of Wharton's Criminal Evidence, 10th ed., *People* v. *Doyell,* 48 Cal. 85, *Barkly* v. *Copeland,* 74 Cal. 1, [5 Am. St. Rep. 413, 15 Pac. 307], and it could be plausibly urged that we have here such an exception. However, the rulings can be supported on other grounds.

In the first place, the said questions asked of Cockrum were entirely proper in view of his cross-examination. After his attention was called to his testimony before the grand jury he was asked by appellant whether such statements were true and "how did you come to give that testimony before the grand jury if it was not correct?" His answer was: "Well, I was very nervous and had not slept any for some time and was in pretty bad shape, and I was thinking about losing my eyesight so much and so much had been talked to me about Shaw's story about what he told about shooting me, and I come to think his story was true or something to that effect. Seemed later I could not remember seeing him that

day. I thought of that at nights when I could not know where I am at.'' He was further interrogated about whether he had talked to anyone in reference to his recollection of the affair. This was all brought out for the first time on the cross-examination and the door was certainly thereby opened for the further inquiry by the people. Besides, it could hardly be said that the testimony to which objection was made added virtually anything to the force and effect of Cockrum's statements which were elicited by appellant.

Moreover, it is plain that the purpose of these questions was to throw light upon the mental condition of Cockrum at the time of his testimony before the grand jury and at the trial. The experts had testified as to the effect upon his mind produced by the frightful injury, and how his memory might be gradually or suddenly restored, and to his susceptibility to the influence of statements and suggestions made by others. In other words, these witnesses had testified that while his mind was impaired, he would be likely to accept the statements of others as the product of his own recollection of the events, but that when his memory was entirely restored, he would be able to distinguish between what he was told and what he had himself observed.

They also declared that when he recovered his normal mental activity he might not be able to recall any impressions whatever of the immediate circumstances of the shooting, although his memory might be accurate as to what happened a short time before.

These experts had portrayed in the abstract the situation as to his mentality, and there was no better way than by recitals of the conversations with him on the subject to present a concrete view of the actual effect upon his memory and reasoning faculties of the dreadful physical and nervous shock.

We may say, also, that if the form of some of the questions was objectionable, no prejudice resulted. No doubt, it would have been better practice to ask the assistant district attorney to repeat what Cockrum said, than to inquire how it corresponded with what the former repeated to the latter, but the consideration is not of sufficient moment to demand serious attention.

Even if it should be held that the whole line of inquiry was improper, it could be demonstrated that it was more

favorable than otherwise to appellant. Indeed, one can hardly avoid the conclusion from a careful reading of the transcript that Cockrum was trying as far as possible to favor the appellant.

We think the judgment is just and should be affirmed, and it is so ordered.

Chipman, P. J., and Hart, J., concurred.