[Crim. No. 4073. Second Dist., Div. Two. Mar. 21, 1947.]

THE PEOPLE, Respondent, v. JACKSON M. WEATHER-FORD, Appellant.

Ben Van Tress and James R. Jaffray for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, W. E. Simpson, District Attorney, Jere J. Sullivan, Robert Wheeler and J. Miller Leavy, Deputy District Attorneys, for Respondent.

MOORE, P. J.—By indictment presented on November 10, 1943, appellant was accused of the murder of one Mary Annette Struck. After a second trial a verdict was returned on June 14, 1946, finding him guilty as charged with recommendation of life imprisonment. From both the judgment and the order denying a new trial comes this appeal. Appellant bases his demand for reversal upon the insufficiency of the evidence and errors in giving and refusing instructions.

### The Evidence Is Sufficient

This is the second appeal. In an elaborate opinion (27 Cal.2d 401 [164 P.2d 753]) the Supreme Court reversed the first judgment because (1) the proof received at the first trial was wholly circumstantial; (2) there were many conflicting inferences deducible therefrom; (3) of illegal procedure in the communications between the court and the jury through the agency of the bailiff, which constituted reversible error under "the particular facts of the individual case"; (4) the advice sought was on the pertinent question of who should prove the presence of defendant at the scene of the murder, to which the judge returned an incorrect reply; (5) there was not "overwhelming evidence of guilt" as in People v. Alcalde, 24 Cal.2d 177 [148 P.2d 627]: (6) "the evidence is such that the jury could reasonably have arrived at opposite conclusions"; (7) rejection of testimony of declarations of deceased.

Not only is the present record devoid of such errors, but the evidence adopted by the jury is reinforced by the testimony

of a witness who saw appellant at the scene of the crime and by the testimony of 15 other witnesses. And also, the incriminating circumstances detailed at the first trial were multiplied and burnished at the second. ■ Although commonplace it may not be amiss to repeat the law that the implied findings of a jury cannot be upset by the reviewing court unless upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached by the jury and approved by the trial judge, and that ''if the circumstances reasonably justify the verdict . . . the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury.'' (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Woo*, 181 Cal. 315, 326 [184 P. 389].) ■ Although an appellate court will not approve a verdict based upon evidence inherently improbable, unusual circumstances do not come within such classification and will not, because unusual, constitute the basis of a reversal. To justify the rejection of testimony that convinced the jury there must exist either a physical impossibility that it is true or its falsity must be apparent without resorting to inferences or deductions. (*People* v. *Huston*, 21 Cal.2d 690, 693 [134 P.2d 758].) Even though the testimony adopted by the jury is subject to justifiable suspicion, still such suspicion does not justify the reversal of a judgment the deriving of which is the exclusive function of the trial court. (Ibid.) With such ancient and classic rules for guidance in considering this appeal a summary of the proof presented upon the second trial will demonstrate that an affirmance is unavoidable.

## I

### Deceased Was an Unsatisfactory Tenant

In December, 1942, appellant leased to Mary Annette Struck the Oh Johnnie's Cafe at 100 North Avenue 50 in the Highland Park community of the city of Los Angeles. The term was five years at a rental of five per cent of her gross receipts.* They had met after his reply to her ''lonesome ad'' in a local newspaper. Prior to his transaction with her his income from the cafe had been over $100 monthly. Their relations became strained soon after her occupancy. While he endeavored to induce her to enhance her patronage she would

---

*Also he gave her a lease on a seven per cent basis, but they acted upon that which required her payment of five per cent.

not do so, preferring to sell her interests. He sued her once for $11.25 but they continued for some time on ostensibly friendly terms. At times he shopped for her. Although she had agreed to settle weekly she excused her own dereliction and forced appellant to wait until March 17, 1943, when they had their only accounting. About the latter date they agreed that she would leave the cafe on March 25, 1943. He served a notice to pay rent or quit and about March 23, he served her with eviction papers, terminated her lease and fixed her rental at $50 per month.

### Appellant Complains Bitterly of Deceased

During the period preceding April 5, 1943, the date of Mrs. Struck's death, whenever appellant met Mrs. Farmer or Mrs. Miller, who resided near the cafe, he spoke bitterly of deceased and of how dirty and filthy she was. She had parked her trailer on his lot adjacent to the cafe. He showed the two neighbors the human excrement near the trailer in which she slept. He was very nervous and walked the floor, declaring deceased was the dirtiest, filthiest, nastiest woman he had ever dealt with, and with vehement gesticulations declared he would do anything to get her out of the cafe. He telephoned the health authorities about her violating sanitation laws and asked Mr. and Mrs. Farmer to make complaint. He was angry, upset and nervous in March when he talked with Mr. Dauk, licensed realty operator, explaining his trouble with Mrs. Struck in that she violated the federal rationing law and constantly violated the health laws; that she was supposed to have a lease but he did not believe he had signed it; that she had forged it; that five per cent of the cafe's receipts should pay more than the $30 as shown by the only two checks he had received; that Mrs. Struck was crooked, was stealing money from him. He induced Dauk to have her list the cafe for sale with him but not to let her know that appellant had anything to do with it as she would demand more; that the $1,000 she asked was too much. About April 3, in a conversation with Reese Farmer appellant stated that decedent claimed to have a lease on the Oh Johnnie Cafe; that he would like very much to get her out; that he had another who wanted to lease the property. Late in March appellant told a police officer that he had leased the Oh Johnnie to Mrs. Struck; that after checking up he thought she was taking out

his pots, pans, and silver, and asked the officer to search the cafe.

### She Foils His Efforts to Oust Her

In February Steve Salatich, an experienced cafe operator in the Highland Park area, in company with appellant appraised the Oh Johnnie and offered $60 monthly rental to be increased to $75 after three months. After appellant had conferred with deceased he reported to Salatich that she would vacate within a week. In Salatich's presence deceased told appellant to rent the place to him. In a subsequent conversation appellant told Salatich his tenant would be out in a few days. His next report to Salatich was that she had not given him the key; that he could not get her to leave. About March 28, Salatich visited the cafe and found Mrs. Struck dressing to go into the city with a lady friend who was present. After deceased had cursed a volley the friend stated to Salatich that they were going "to see a friend of mine to see what can be done about keeping Mr. Weatherford from putting her out." Salatich never saw Mrs. Struck again.

In early March appellant asked Jack Branham, a cook who had formerly worked in the Oh Johnnie, to appraise equipment there. He did so and reported that it was worth from $350 to $400 and that the best way to get Mrs. Struck out was to buy her out for as much as $500. In conversation with deceased she told Branham as an inducement to him to work for her that she had an ironclad contract. In conversation with appellant Mr. Branham was told that Mrs. Struck had no contract; that he wanted her out of the cafe but it looked like he could not get her out. Later appellant said to Branham, "If you will go down there and go to work; steal that contract and . . . bring it to me I will pay you double what I owe you." He there referred to an old debt of $135 which a former tenant of the cafe had owed Branham and which appellant had assumed. Later when they met on the street appellant offered Branham $2,500 to "get Mary Struck out of the building . . . Get her out any way you can get her out and I mean out . . . Get rid of her for good . . . I will give you $2,500 to get rid of that woman."

In early March appellant took deceased and Orpha Hayden to see the Hurry Back Cafe and there tried to induce deceased to take the Hurry Back instead of the Oh Johnnie, but she did not like it; "She was planning on going to the mountains—she would not want to change."

## He Reports Her to the Authorities

About February 15, appellant reported to the city sanitation inspector that deceased was living in a trailer by the Oh Johnnie Cafe and was operating the cafe in an unsanitary manner. The inspector visited the place and instructed her to cease sleeping there. On his next visit he found a bed and mattress still in the vehicle, but at a later visit found in it no sleeping equipment. He did not inspect the restaurant's toilets.

February 13, appellant complained to the O.P.A. of decedent's failure to report sugar on hand. On February 20, he exhibited 165 pounds of sugar which he asserted had been illegally stored by deceased.

## Appellant's Deceptive Remarks Concerning Decedent After April 5

In April appellant told Salatich he had bought out decedent for $350 and exhibited a bill of sale (Exhibit 19), whereupon Salatich remarked that he "didn't know she had that much stuff in there." That conversation and display of the bill of sale was about five days prior to the discovery of her body. However, two days after he had shown Salatich the document he told his prospective tenant that Mrs. Struck had gone to Fresno and he did not know what to do. About three days before the decaying corpse was found Salatich's attorney advised appellant to enter Oh Johnnie Cafe. Salatich suggested that he first confer with the police.

## Paul Farmer, Witness to the Final Scene

April 5, 1943, Paul Farmer, age 15, lived with his parents at 4993 N. Figueroa Street. About a week prior to April 5, he saw appellant and the deceased outside of the rear of the cafe storeroom. Both were angry. Appellant then told Mrs. Struck that he wanted her to leave and that if he did not get the lease he was going to do something drastic. Her reply was that she would get out when she got good and ready. On the evening of April 5, having delivered his newspaper route, Paul arrived home about 7:30 p. m. Finding no one present he put on some food to cook, took his sandwich to his bedroom, turned on the radio and opened the window. On previous occasions he had heard appellant and Mrs. Struck talk together. While sitting by the open window he heard unusual noises coming from Oh Johnnie's cafe like "two people cussing

each other." He distinguished Mrs. Struck's voice and the voice of a man. Deceased was yelling the more loudly of the two. He could understand her and had no trouble at all in hearing both of them. He drew back his curtain and looked into the rear window of the cafe storeroom which was about 25 feet away. Neither blind nor curtain obscured his view. Through the storeroom window and the passageway into the kitchen he could see into the cafe dining room. The storeroom was lighted as he watched and listened for about two minutes. He saw and recognized both Mrs. Struck and Mr. Weatherford. The latter wore a medium gray suit but he did not wear a hat. (Subsequently appellant told the officers that he wore his gray suit on April 5.) Paul knew appellant's voice. The two were near each other, appellant facing deceased. She stood in the storeroom entrance to the passageway into the kitchen. Appellant was visible from his neck to his knees as he stood about a foot from and directly in front of Mrs. Struck facing her with his back toward the window through which Paul observed. Although they talked in about the same pitch Mrs. Struck's voice was quite loud. She raised it a little as her anger increased. Paul could understand her words. At first deceased held her hands by her sides, but when she cried, "No, no," to appellant she moved her hands away from her body with the palms out, and put her hands up as appellant talked.

At about this juncture, having observed for about two minutes, Paul pulled the curtain back over his window so that he could not see into the storeroom. While he listened to the radio the voices from the cafe continued in about the same volume. In approximately two minutes he heard the loud scream of a woman in the cafe. He then turned out all the lights in his house, pulled back the curtain, and for five or ten minutes turned his gaze toward the cafe storeroom window. Though the cafe was still lighted he could see no one there. The storeroom window was blacked out by something over it. Only about two and one-half inches of light were visible at the top. After about five minutes the lights in the cafe were extinguished. During his watch Paul saw no one leave the rear of the cafe but he could see neither the front door nor either of the two outside doors into the storeroom. Frightened, the boy turned on all the lights in his house, never finished his evening meal, covered himself up in his bed. After that night he never saw Mrs. Struck again.

Paul's explanation for not identifying appellant at the former trial as the man he had seen in the storeroom with Mrs. Struck was his fear that appellant might do harm to the Farmer family. Prior to the afternoon on which he gave his testimony at the second trial he had not told any official that he could identify appellant as the party present in the storeroom on the night of April 5. When the parents of the boy returned home about 11 p. m. they knocked on the door, rattled the windows, and called their son but he did not let them in. After they had gained entrance into their home they found Paul in bed and covered up, although he was awake, scared, nervous, in a sweat and appeared to be ill.

### Silent Witnesses

(1) When the Farmers left home about 7 o'clock that evening the neon lights were burning on the clock in the cafe. Looking into the place on his return for the lighted clock, Mr. Farmer observed that there were no lights in the cafe. Prior to that occasion the clock was always lighted when Mr. Farmer passed by on his way home at night. (2) When appellant met Orpha Hayden near the cafe on April 5, and inquired as to decedent, appellant's response was: "Well, she closes on Monday." (3) When appellant called at the Farmer home on April 9, to collect rent Paul observed that he was nervous and weak. He told his mother that the man was sick. Appellant inquired of Mrs. Farmer whether she had seen Mrs. Struck the last few days. (4) After she had answered in the negative he asked her if she had heard any noises down at the cafe. (5) On receiving another negative reply he told her that he was on his way to return a can of shellac which Mrs. Struck had accused him of losing when he moved her into the cafe, and (6) that Mrs. Struck had gone on a trip, that (7) while he did not know of her whereabouts he guessed she was visiting relatives.

(8) Notwithstanding appellant's account to the police that he had shut off the water in the kitchen of the cafe on the morning of April 18, and that it was at that time running a stream "as big as your finger," the jury must have determined the falsity of his utterance when they heard the experience of Patrick Shephard, a lad 12 years of age who at the time of the trial lived near the cafe and played in that vicinity. While he was there at play on a certain Monday in April when it appeared that the cafe was closed, he looked through

the cafe into the kitchen and heard a stream of water running into the sink on some dishes. He opened the door near the kitchen window about three inches, then frightened at his own boldness he ran away. Later he reported his experience to Mrs. Farmer who placed the occurrence on April 8. Four or five days later the boy returned to the cafe and again looked and listened. No water was running at that time from the same faucet. (9) At a later time in the presence of representatives from the district attorney's office the boy adjusted the water to run in the sink at the rate it maintained on April 8. A measure of the rate of flow determined that it was flowing at the rate of three gallons per minute. A computation by witnesses of the time required for water to flow at the rate of three gallons per minute disclosed that if the water had been turned off on the morning of April 18, as appellant had stated to the police, the meter would have registered 7,230 cubic feet of water instead of 2,400 cubic feet which actually did pass through the meter. The latter amount is approximately the quantity that would have passed through the meter between April 5, and several days after April 8, when Pat Shephard could no longer hear the water running.

(10) The officers found no gas in the jets on the dining room range. After many denials that he had turned off the gas appellant finally admitted to Officer Ledbetter that he had shut it off on April 6, thinking deceased had gone to the city of Bishop. During the two full months of deceased's occupancy her average monthly consumption of gas was 5,650 cubic feet, a daily average of 188 cubic feet. Only 1,500 cubic feet were used from March 27 to April 23. Such amount is the same she would ordinarily have consumed from March 27 to April 5.

(11) Coins were found on the floor; a lady's purse in a kitchen table drawer contained currency totaling less than $4.00. Nowhere could the authorities find a trace of the $350 which appellant asserted he had paid her. The total of her money on deposit in a bank was $134.64.

(12) In checking appellant's statement that he had purchased deceased's refrigerator the officers searched for a document which might refer to its sale for $350, but none could be found. Exhibit 19, having been photographed by the infra-red process, was revealed to be an altered document. It was originally a bill of sale of the refrigerator. Among the effects of deceased were several documents evidencing transac-

EXHIBIT 19

tions between her and appellant, to wit: Exhibits 21 and 23, the two rental contracts for 7 per cent and for 5 per cent of the gross receipts; a notice to pay rent or quit; an agreement for trailer space rental; an affidavit for the small claims court —all in the writing of appellant. Also there was a typewritten notice to vacate in 30 days, dated March 3, 1943, and signed by the hand of Mr. Weatherford.

(13) On the afternoon of April 5, at about 4:30 o'clock, Mrs. Farmer saw deceased on Avenue 50 about one-half block

from the cafe, walking toward it, carrying four full shopping bags. This was in effect a contradiction of appellant's statement to witnesses that decedent had said she was going to the mountains.

(14) Mrs. Farmer was at home at 7 and 9:35 a. m. on April 18, and had a nonmetered telephone which appellant might have used for notifying the police of his discovery. The two wires into the cafe telephone were on April 19, found to have been cut with a dull instrument.

(15) The investigators having concluded that death had probably resulted from the blow of a hammer, asked appellant for a description of such hammers as he possessed. All but one were found.

(16) When the police entered the storeroom after scenting the decomposed flesh they observed that its only window was covered with a piece of plywood which excluded the light. It was practically of the same dimensions as the glass. It was this window through which Paul Farmer witnessed the quarrel on April 5. Other than the owner of the premises would any one have stopped to cover the window pane?

(17) When an officer told him to allow the residue to be removed from beneath his finger nails to see whether it contained any blood, appellant stated that two weeks before he had cut himself while shaving and that he had used a "short styptic pencil and you will find blood under the fingernails of my left hand." When asked why he did not use the styptic pencil with just one hand he replied that he had used both hands. When arrested on November 4, 1943, he was locked in his apartment where he lived alone. While he was apparently planning to evade the officers he wrote notes to inform his wife about "an injunction against disturbing that ice box." He had $1,149.49 on his person, evidence of an intended flight.

(18) After April 5, he never repeated his violent criticisms of deceased such as he had made to Mrs. Farmer.

(19) He at no time parked his car in its accustomed place by the cafe between April 5 and April 18.

(20) He lost 20 pounds in weight during the six weeks prior to April 21, and did not sleep over two hours a night.

### APPELLANT'S ACTIVITIES AFTER APRIL 5

(1) On April 17, appellant in a very excited state complained to the detective bureau that deceased was running his cafe at a loss; he wanted her out; and produced a receipt

which looked like Exhibit 19 or 29*. He said that he had paid her $350 for some of her equipment but did not know where she was or had been for some time; that though she had been living in a trailer it was now locked. He wished to be certain that he would not get into trouble if he entered the cafe. (2) On the evening of the same day the offensive odor of rotten flesh permeated the atmosphere near the cafe. Such was proved by Mrs. Farmer whose front porch was only 25 feet from the rear door of the cafe. On the following morning appellant opened the place about 7 o'clock. The jury probably determined that he too had become distressed by the ill-scented airs. However, he did not venture to announce his discovery at that hour. That he did enter the front door of the cafe that same morning at 7 o'clock was established by the testimony of the witness Dietz who lived near by and whose office was about 200 yards north of the cafe and on the same side of the street. He had seen appellant two or three times a week in or near the cafe prior to April 5. On the morning of the 18th a message to his home required him to go to his office. He arrived there at 7:10. As he walked along the street on the side opposite the cafe his attention was attracted by appellant's entering and closing the front door of the place. Appellant was turning the knob when first noticed by Dietz. At nine o'clock appellant returned and entered the place, then drove back to his apartment to telephone the police. (3) After 10 o'clock while the police were there the witness heard appellant tell the officers that he had come to the cafe on several occasions but found no one there and the place appeared to be closed; that when he had first called at 7 o'clock the front door was locked, as it had been on other occasions, but he had returned at 9 a. m. when he gained entrance at the rear through an aperture caused by a previous removal of a pane months before, and thus found the body of deceased; and that on discovering the body he returned to his apartment six blocks away to notify the police. His excuse for not using the telephone in the cafe or across the street was to ''save a nickel.''

(4) During the visit of the officers he was very nervous, walking from front to rear, talking and mumbling. After parrying his inquiry the officer asked him the same question,

*The contents of Exhibit 29 are almost identical with those of Exhibit 19, but it is written with a graphite pencil and the words constituting the receipt and the list of articles reserved are on both sides of the paper.

"What do you think about this? His response was, "Why it looks like a robbery." He then asked, "Where is the money that I gave her?" He brought forth a writing from his pocket (Exhibit 19) which he explained was "a bill of sale and the things on there she is supposed to reserve for herself. . . . I bought an ice box from her for $350." In answer to Officer Pinker he stated that there had been no disagreements or difficulties with deceased; that she had promised to vacate at an early date, and offered the bill of sale in verification of his declaration.

(5) About 9:35 a. m. appellant, excited and incoherent of speech, reported his discovery of the body to the police. He told them it was murder because he had not seen his tenant for several days; that his attorney had advised him as owner he had a right to break into the house.

Questioned about a padlock found under the counter appellant at first denied knowledge, denied ownership, denied ever having seen it before. He later admitted that he had used it to lock the trailer pursuant to orders of the Board of Health. An examination of the trailer by use of keys found under the counter disclosed the mattresses were gone. They were later found in one of the lavatories.

### His Statements to the Police and His Activities on and Subsequent to April 18

After discovery of the corpse appellant told the officers that he last saw deceased alive on Sunday, April 4, about 6:30 a. m. and that he was never in the cafe any more until he opened it on Sunday the 18th; that he had talked the business over with her on March 23, when she rejected his offer of $150 for her ice box but agreed to accept $350 for the ice box and a few other things; that he then went for the money and on returning made a memorandum (Exhibit 19) of 10 or 12 things she wished to reserve. He was not particular about a bill of sale but when he wrote it and laid the $350 on the table she took a pencil, made an O.K. and signed it "M. A."; that when she started to print her name he told her to write it with his indelible pencil; that after she had traced the other signature she promised him possession on March 25, but when the drayman called to move the refrigerator to another cafe she asked permission to stay a little longer to use up the supplies on hand; that rather than have the place closed he said he permitted her to remain; that on Friday before the final closing of the cafe she desired a gallon of white shellac

for the floors of her apartment on Avenue 33; that he bought the shellac on April 5, but he could not give the address of the paint shop where he had made the purchase; that on the afternoon of that day he went to the cafe with the shellac but Mrs. Struck was out; that he still had the shellac in his automobile. However, it could not be found. He said he had purchased the shellac at about 5300 N. Figueroa Street, but no shop for the sale of such merchandise was found by the officers in that vicinity.

### Hoaxes Attempted by Appellant

Answering an officer's inquiry as to decedent's male friends, appellant said that one night about three weeks prior to Mrs. Struck's disappearance he had come to the cafe at 8 o'clock and found men sitting with her at the kitchen table talking in a strange tongue, examining maps and charts; that she told appellant to get out. He could not describe the persons he claimed to have seen. Four days later he admitted to Officer Ledbetter that the men he had seen were Steve Salatich and Leo Winter, and that what he had said about German spies was a hoax.

Two days after the discovery of deceased appellant gave Officer Ledbetter a note as follows, "Keep your mouth shut or you will be sorry. I mean it." Nervous and worried, he said that when he arose that morning he found the note under his door and that he had received eight or nine telephone calls threatening his life. Later he confessed that he had printed the note declaring, "we won't talk about it any more."

About 3 a. m. on the 22d of April, Officers Fator and Weaver answered a call to go to appellant's apartment over some stores at 5529 North Figueroa Street. When they arrived at 3:10 appellant had a small amount of dried blood on his forehead and on his nose. His hair was ruffled and a small, uneven, singed spot the size of a quarter was evident directly in the back of his head. Some slight abrasions on his forehead appeared to have been made with a sharp instrument. On two or three slight cuts on his temple the blood had dried. An old quilt with small burnt holes, a small towel and an old overcoat betrayed the hoax which appellant had arranged to perpetrate. He related that there had been a knock at the door at 1:30 a. m.; that on opening his living room door a strange man entered, who with his fist struck appellant several times on the face and said, "I'll teach you to talk" and knocked him

unconscious; that on regaining consciousness about an hour and a half later his hands were tied with the towel and the old quilt and coat were over him, smouldering. He suspected Nazi agents and the party who had telephoned. An examination by Officer Fator disclosed no evidence of a blow upon appellant.

Between 9 and 10 o'clock of the same morning Officer Ledbetter called to make further examination of appellant's injuries. He was told that when appellant opened his door at 1:30 a. m. someone struck him in the eye and knocked him unconscious; that the knots on his head from blows had gone down. The officer found three or four superficial cuts less than a half-inch long, an inch below the hair line. The burned place was the size of a dime. Photographs of his position as he was left tied up and of the burn on the quilt were exhibited to the jury. Acting upon Ledbetter's request appellant accompanied the officer to the receiving hospital to ascertain the extent of his injuries. On the way the appellant was observed twisting his right cheek with his thumb and forefinger. This resulted in a large bruise on his right cheek. At the hospital the officer requested a complete examination in view of appellant's claim that he had been rendered unconscious, and repeated to the physician appellant's statement that he had been hit over the head. The doctor testified that the only injuries found were superficial; that no treatment was necessary; that he had not been rendered unconscious. When the doctor asked him "what he was trying to pull off" appellant remained silent. When Ledbetter asked him why he did not tell the truth about the matter appellant replied, "We won't discuss it further." After they had returned to the station appellant admitted to the officer, "I made it all up myself. It didn't happen." From such dishonest behavior of appellant his consciousness of guilt was a reasonable deduction.

### THE AUTOPSY

The Oh Johnnie Cafe faces North Avenue 50 on the north. Its east side stands near Figueroa Street which extends north and south. The officers entered the cafe through its east rear door which opens into the storeroom. They found the decomposed body on the west side of the storeroom at the foot of a door which had been designed as an opening to a private walk leading to North Avenue 50. The threshold of that door is about seven inches above the level of the storeroom floor. Decedent's head lay toward that door while her feet extended

toward the entrance on Figueroa Street. The door near her head is a solid, two-panel construction and was so closed that it could not be opened from the outside. The woman's head was crushed and covered with blood and her body was decomposed. The skull was torn and destroyed over the frontals, and a round hole one inch in diameter was on the left of the median line of the forehead. Other fractured areas were found on both the front and back of the head. The autopsy surgeon opined that the blows to her head had been caused by an ordinary nail hammer.

### APPELLANT'S FORGERIES

Notwithstanding his emphatic denials it was established by all the handwriting experts that both sides of Exhibit 29 were in the handwriting of appellant, including the purported signature of deceased. It is a list of articles reserved by and a receipt for "payments in full for all I had at 100 North Avenue 50 less above named articles" etc. It was found in his apartment in a drawer between two books. In the same drawer was a red covered notebook which contained practice writings similar to those on Exhibit 29. The paper of both Exhibits 19 and 29 were taken from that notebook.

The experts agreed that Exhibit 19, which is substantially the same as Exhibit 29, is a substitute for its original contents. The erased under-writing was reproduced by infra-red photography. "O.K. M. A. Struck" had been first written in ordinary carbon pencil, which after being erased was traced with indelible pencil. All of the over-writing including "O.K. M. A. Struck" was proved to be that of appellant. From his possession of documents forged by his own hand but purporting to have been written by the person whom he detested and for whose removal he had offered to pay $2,500, the jury could reasonably draw an inference of appellant's guilt.

### APPELLANT AVOIDS CROSS-EXAMINATION

Despite all of the facts established against him the prisoner made no offer to explain one of them. His complete direct examination consisted of a negative answer to one question, to wit: "Did you ever strike a woman by the name of Mary A. or known as M. A. Struck?" Such disdain of circumstances which showed his hatred of deceased; his inimical attempts to oust her from the cafe; his provocation at her withholding his property from which he could have been receiving a substantial rental; his quarrels with her; his request of the witness

Branham to steal the lease and his offer of $2,500 to that witness to "get rid of her"; his statement to Mesdames Farmer and Miller that he would do anything to get rid of her and that he would do something drastic if she did not return the lease; his forgeries of her receipts for $350 from him and the nondiscovery of evidence that she had ever gained possession of that sum; his quarrel with her in the cafe an instant before her final scream; his nonappearance at the cafe for two weeks following her disappearance; his entry through the front door at 7 a. m., which he denied, and his delayed announcement at 9 :30 on the morning of April 18 of his discovery of her body—such facts required the accused to explain, if he was in fact innocent. The jury were warranted in finding from his silence additional evidence of his guilt. Such proof was of a more serious nature than his silence would have been in the presence of the police under similar accusation. Before an accusing officer an innocent suspect is often warranted in maintaining silence. Not so before the court where final search is made for the truth and the outcome may depend upon the defendant's testimony or upon his failure to explain. Appellant's silence before the jury was tantamount to a derisive thumbing of his nose at the prosecution and the mass of evidence which had gone into the record. The inferences deducible from his failure to explain were persuasive and substantial evidence. They added much to the force of the proof of the avenging circumstances which were built up by his own deeds.

## A Murder Was Proved

The autopsy disclosed that deceased suffered death by criminal means. There is not a circumstance to indicate that she inflicted the wounds upon her own head. Everything warranted a finding that she was the victim of a criminal agency. The only findings implied that required close scrutiny on the part of the fact finders were (1) that appellant applied the force that extinguished the life of the unfortunate woman and (2) that it was done with premeditation and with malice aforethought. His visit alone to her in the night, when she was unattended, his quarrel with her without apparent purpose other than to work up his blood to a vicious pitch, his beating of her body until life was extinct, strongly imply that he acted with malice; while his hostile complaints over a period of two months and proofs of his expressions of hatred of her prove such express malice as constitutes an element of

murder. (*People* v. *Cook,* 15 Cal.2d 507, 513 [102 P.2d 752].) Since it was done with deliberation and premeditation it was unnecessary to prove the use of the means mentioned in section 189 or an attempt to commit one of the crimes enumerated therein. That he was at the scene of the crime the jury evidently had no doubt, for there was no such inherent vice in the testimony of Paul Farmer as to render it irreconcilable with truth. The boy recognized appellant; his position for observation was only 25 feet away; he heard the querulous voices; he saw deceased raise her hands and heard her cry, "No, no," as though she were pleading, and heard her last scream. Such was substantial evidence and it supports the jury's implied finding. (*People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402] ; *People* v. *Farrington,* 213 Cal. 459 [2 P.2d 814].) As said in the Braun case, where the testimony is positive and direct that the accused perpetrated the crime it is incumbent upon him to show that it is inherently incredible before he can prevail. The accuracy or doubtfulness of the identification, the incompatibility in the testimony, if any, and the uncertainty of the witnesses, if any, were matters solely for the consideration of the jury and of the trial court on the motion for a new trial, and when the court has thus approved the finding of the jury such finding may not be disturbed on appeal. (*People* v. *Farrington, supra,* p. 463.)

That appellant had motive for the crime was to be readily inferred by the jury. His irritation caused by decedent's lack of success and her unsavory personality, his zeal to oust her from possession in order to increase his income, her stubborn tenacity in resisting his attempts to gain possession, and perhaps his desire to conceal his forgery and to save $350, —all these may reasonably explain his motive for the deed. Thirty-three days after he had served upon her a notice to vacate she was killed. The evidences of appellant's motive tended to identify him as the culprit. Evidence of motive adds warp to the pattern of guilt woven of circumstance. Whatever fact tends legitimately to show motive is proper proof of an assumed motive for the crime. (*People* v. *Soeder,* 150 Cal. 12, 15 [87 P. 1016].)

The fact that about November 4, 1943, appellant had on his person a large sum of money, in his apartment without any explanation thereof, and that he had prepared instructions to his wife for the care of certain business, show an intention

of flight. At that time he attempted to escape from his apartment although he knew that he was under official surveillance and that the minions of the law might call at any time. Such attempt and the attendant circumstances were evidences to be considered. (*People* v. *Hall*, 199 Cal. 451, 460 [249 P. 859].) So, also, his false statements and the forgery of documents were proofs of his zeal to mislead the investigating officers, and they justified unfavorable inferences against appellant. (*People* v. *Peete*, 54 Cal.App. 333, 352 [202 P. 51].) For the owner of a cafe under lease to a lone woman with whom he had quarreled and against whom he had complained and whom he had suspected of dealing with the enemy in time of war, to pass by the cafe for two weeks without making inquiry; for him to write a note to himself to induce the officers to direct suspicion to others and falsely to report that he had been assaulted and made unconscious by a mysterious person—these were evidence of attempts to direct the search of the officers for Nazi spies or other evil agencies.

After a careful review of the facts of this case there is nothing found to justify or excuse the homicide. (*People* v. *Wells*, 10 Cal.2d 610, 617 [76 P.2d 493] ; *People* v. *French*, 12 Cal.2d 720, 775 [87 P.2d 1014] ; *People* v. *Thomas*, 25 Cal.2d 880, 904 [156 P.2d 7].) By reason of his advanced age and life of clean record his predicament has been considered with unfeigned compassion. But despite such sympathy neither this court nor any other can warp the rules of practice to afford him the slightest comfort. The State exacts the complete and loyal service of every agency that serves her, and the judiciary is no exception. Under the authorities it must be held that the evidence presented to the jury was substantial and justified the finding of guilty. This conclusion is derived despite the reversal of the first verdict which was rendered necessary by reason of procedural errors. That opinion did not determine the sufficiency of the wholly circumstantial evidence to support a verdict but merely held (1) that an instruction assumed the existence of a fact and that it was prejudicial in a case where no eye had seen the accused at the scene of the crime, and (2) that the conduct of the court in sending a private communication to the jury concerning a pertinent issue and incorrectly advising them is reversible error where the evidence is such that a jury might reasonably have found either for or against the accused.

## II
### No Prejudicial Errors in Instructions Given

The proof against appellant consists in the main of a web of circumstances and events put in evidence by a number of witnesses. Paul Farmer is the only person to testify to the actual presence of appellant at the scene of the crime. At a former trial and before the grand jury he had refused to identify the accused as the man he had seen at the time when he heard and saw decedent and a man in a heated argument, followed by the woman's scream. As shown in the summary on the second trial in April, 1946, three years after the crime, he testified that as he watched the argument of the deceased and the man he recognized that the latter was appellant. Because the evidence consisted primarily of circumstances and because of Paul Farmer's tardy identification of appellant as the man he had seen quarreling at the scene of the crime, it is now contended that the language of the court's instructions in specified particulars was erroneous and prejudicial under the doctrine announced in *People* v. *Williams,* 17 Cal. 142, 147, and that appellant is entitled to a reversal notwithstanding the constitutional ban upon setting aside a judgment for error in instructions, unless the entire record reveals a miscarriage of justice. (Const., art. VI, § 4½.) He quotes from the court's instruction on murder and manslaughter the following passage: "All murder which is committed willfully, deliberately and premeditatedly, is murder of the first degree. All other kinds of murder are of the second degree."*

---

*Murder and Manslaughter Defined and Distinguished.

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.)

Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Pen. Code, §·188.)

All murder which is committed willfully, deliberately and premeditatedly, is murder of the first degree. All other kinds of murder are of the second degree. (Pen. Code, § 189.)

In dividing murder into degrees the Legislature intended to assign to the first as deserving of greater punishment, all murders of a cruel and aggravated character, and to the second all other kinds of murder, and to establish a test by which the degree of every case of murder may be readily ascertained. In cases of murder of the first degree it must be established that the killing was willful, deliberate and premeditated. The test may be thus stated: Is the killing willful—that is to say, intentional—deliberate and premeditated? If it is, the case falls within the first, and if not, within the second degree. It must be formed upon a preexisting reflection and not upon a sudden heat of passion sufficient

Section 189, Penal Code, reads as follows: ''[Degrees of murder.] All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree.''

Because of the absence from the second paragraph of the instruction of a listing of the specified means whereby murder is perpetrated and of the names of the major crimes in the attempt to perpetrate which a homicide becomes murder of the first degree, appellant contends that the jury were not adequately or accurately instructed and that he was thereby prejudiced. (Citing *People* v. *Holt*, 25 Cal.2d 59, 70, 87 [153 P.2d 21]; *People* v. *Thomas*, 25 Cal.2d 880, 896 [156 P.2d 7].) He argues that the ''specific statutory enumeration was not given to the jury,'' and that not having this measure of the statute the jury could not decide whether the murder was first or second degree. Inasmuch as there was no claim by either party that decedent came to her death by means of poison, lying in wait, torture, no claim that she was killed while her assailant was perpetrating or attempting to perpe-

---

to preclude the idea of deliberation. It is necessary that the act of killing be preceded by and the result of a concurrence of will, deliberation and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree. (*People* v. *Maughs*, 149 Cal. 253, 263 [86 P. 187]; *People* v. *Nichol*, 34 Cal. 211, 213-5; *People* v. *Morine*, 61 Cal. 367, 369.)

There is nothing in the sections of the Penal Code which relate to the subject, which indicates that the Legislature meant to assign any particular period to the process of deliberation or premeditation, in order to bring the act within the first degree. The period of time must, however, be of sufficient length to allow deliberation and premeditation. (*People* v. *Bealoba*, 17 Cal. 389, 395.)

You are instructed that the adjective ''deliberate'' and the verb ''premeditate'' are used in these instructions in their common, well-known, dictionary meanings. Thus deliberate means formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried on coolly and steadily, according to a preconceived design; weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; unhurried; characterized by reflection; dispassionate; not rash. Deliberation means careful consideration and examination of the reasons for and against a choice or measure. The verb ''premeditate'' means to think on and revolve in the mind, beforehand; to contrive and design previously. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8].)

Murder in the second degree is defined as the unlawful killing of a human being with malice aforethought, but without willfulness, deliberation, and premeditation.

If the unlawful killing is done (with malice aforethought) and (without the provocation and sudden passion) which reduces the offense *to*

trate arson, rape, robbery, burglary or mayhem, it was unnecessary to mention those means of effecting a homicide or the crimes there enumerated. Inasmuch as it was not contended that she came to her death by another kind of killing than willful, deliberate and premeditated, it was therefore incumbent upon the court to advise the jury only with reference to a murder so committed, i. e., willfully, deliberately and premeditatedly, in order to constitute it murder in the first degree. The effect of the quoted portion of the instruction on murder and manslaughter was to say that if the murder was not willful, deliberate and premeditated it was of the second degree. A reading of the instruction discloses that it generously treats of the topics that comprise a fair instruction in a case of murder and that its language is worded with care. In attacking it appellant has engaged in a series of dialectical jibes by discoursing upon several passages taken from their settings. For illustration, he takes from the discussion of manslaughter the following: "although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder." He follows that quotation with the comment that "as deliberate intent is not

manslaughter, or is committed in the attempt to perpetrate some felony other than arson, rape, robbery, burglary, or mayhem, or the circumstances of the killing show an abandoned heart, this is murder of the second degree, unless, as has been stated the evidence proves the existence in the mind of the slayer of the (willful, deliberate and premeditated intent to take life), in which case the offense would be murder in the first degree. (*People* v. *Doyeall,* 48 Cal. 85, 96; *Ex Parte Wolff,* 57 id. 94; *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7].)

Voluntary manslaughter is the unlawful killing of a human being without malice—upon a sudden quarrel or heat of passion. (Pen. Code, § 192.)

Manslaughter is principally distinguishable from murder in this: That though the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is the very essence of murder, is presumed to be wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient. (*Com.* v. *Webster,* 5 Cush. 307 [52 Am.Dec. 711].)

And when the mortal blow, though unlawful, is struck in the heat of passion, excited by a quarrel, sudden and of sufficient violence to amount to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter. In such case, although the intent to kill exists, it is not that deliberate and malicious intent which is an essential element in the crime of murder. (*People* v. *Freel,* 48 Cal. 436, 437.)

The law of this state leaves it to you, the jury, to say whether or not the facts and circumstances in evidence are sufficient to lead you to believe that the defendant did, or to create a reasonable doubt in your minds as to whether or not he did, commit his offense under a heat of passion. You are admonished and advised that this heat of passion

an essential in the crime of murder, the instruction is erroneous.'' Such practice is not to be approved. The excerpt was a part of the court's effort to direct the jury to understand that the law regards charitably the weakness of human nature and to convict the accused of manslaughter only if the intent found to exist was not malicious and deliberate.

■ Appellant specifies as prejudicial that part of the instruction on murder and manslaughter as follows: ''In determining the intention of defendant at the time of the transaction complained of, it is important to consider the means used to accomplish the killing. The intent or intention is manifest by the circumstances connected with the offense, and the sound mind and discretion of the accused.'' On the first hearing of this case this court reached the conclusion that it should be guided by the language of the Supreme Court in *People* v. *Peterson*, 29 Cal.2d 69, 78 [173 P.2d 11]; where the ap-

must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless you, the jury, further believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable person. Thus, no person of extremely violent passion may so justify or excuse himself unless the circumstances were such as to arouse the fears of the ordinarily courageous person. Still further, while the conduct of the defendant is to be measured by that of the ordinarily reasonable person placed in identical circumstances, the exciting cause must be such as would naturally tend to arouse the passion of the ordinarily reasonable person. Under these admonitions from the court, the law leaves it to you, the jury, as to the nature of the passion itself. For the fundamental inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary person of average disposition liable to act rashly and without due deliberation and reflection, and from this passion rather than from judgment. (*People* v. *Valentine*, 28 Cal.2d 121, 139 [169 P.2d 1].)

The existence of the provocation which is not adequate to reduce the class of the offense may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after deliberation and premeditation. It is sufficient that the malicious intention precedes and accompanies the act of homicide.

In determining the intention of the defendant at the time of the transaction complained of, it is important to consider the means used to accomplish the killing. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity. (Pen. Code, § 21.)

The willful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent. (2 Bishop Cr. Law, §§ 680-1; *Com.* v. *Webster*, 5 Cush. 305 [52 Am.Dec. 711]; *People* v. *Munn*, 65 Cal. 211, [3 Pac. 650, 2 W.C.R. 748].)

pellant criticized the identical language. In that case the Supreme Court condemned that instruction as objectionable in that it assumes that defendant killed deceased, and held that it should not be given in a case based wholly upon circumstantial evidence where the defendant does not concede participation in the transaction. Such disapproval was because the entire evidence was circumstantial and the accused did not concede participation in the transaction. However, the court concluded: "But the case presented to the jury does not appear to have been a close one and no miscarriage of justice is shown as a result of the giving of the instruction."

Likewise, it is not shown here that any miscarriage of justice resulted from that portion of the instruction criticized, and the circumstantial evidence against Weatherford is just as cogent and convincing as was the proof against Peterson. Moreover, while there was no eye to witness the cruel act of Peterson, a frightened 15-year-old lad observed Weatherford an instant before the final scream of deceased. While Peterson made no concession of his participation, the State made proof of Weatherford's presence by a witness who the jury believed spoke the truth. Therefore, in view of the cautionary instructions given, of the presence near the scene of the crime of a competent witness and of the steel-like web woven about the prisoner by the flood of unexplained facts, it must be here held that there was no prejudice resulting from the criticized instruction and that the cause should not be reversed because thereof.

The lack of merit in the criticism of the instruction appears also from the numerous salutary provisions of the general charge. The instructions in their entirety at once disclose that the jury "are to be governed solely by the evidence introduced in this trial . . . you are the sole and exclusive judges of the weight of evidence and it is your function to determine all questions of fact arising from the evidence . . . an inference must be founded on a fact legally proved . . . you are to judge of the facts upon the testimony and other evidence produced here in court . . . A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal . . . The presumption of innocence attaches to every stage of the case and to every fact essential to a conviction and remains with the defendant throughout the trial to the last and until the contrary is

established by proof beyond a reasonable doubt . . . The jury are the sole and exclusive judges of the effect and value of evidence addressed to them . . . You are free to exercise your own conscientious judgment as to the credibility of a witness . . . The defendant's failure to deny or explain evidence presented against him does not create a presumption or warrant an inference of guilt . . . the jury are the sole judges of the facts."

█ Prejudice is asserted to have resulted from a passage in the instruction on circumstantial evidence to wit: "and it is the invariable rule and law that to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged but *must be inconsistent with any other rational conclusion. Peo.* v. *Heuss,* 95 Cal.App. 680 [273 P. 583]." The instruction is correct. In the Heuss case a similar instruction was criticized because it did not contain the equivalent of the italicized words. In denying the petition for a hearing of that case the Supreme Court observed that the criticized instruction "fell short in not including the well approved and frequently announced statement of the law that the evidence adduced must not only be consistent with guilt but *inconsistent with innocence* in order to justify a verdict of guilty."' The instruction attacked in the instant case is a substantial compliance with the doctrine thus announced.

Appellant in his argument on his asserted error of the quoted instruction contends that "a conviction may not be based upon circumstantial evidence alone unless each circumstance in the chain of circumstances . . . is inconsistent with his innocence." *People* v. *Koenig,* 164 P.2d 923 is not authority for such contention for three reasons, namely: (1) A hearing by the Supreme Court having been granted the decision of the appellate court lost its guiding force; (2) the opinion of the Supreme Court (29 Cal.2d 87 [173 P.2d 1]) repeated the well established rules as to circumstantial evidence but did not approve the language quoted by appellant; (3) the judgment herein does not rest entirely upon circumstantial evidence.

Appellant contends that "from the nature of the evidence and its doubtful sufficiency, it is obvious that if error was committed by the trial court which materially affected the substantial rights of the defendant, and which may have resulted in a miscarriage of justice, such error must be consid-

ered prejudicial and grounds for reversal.'' He thereupon asserts that ''the only evidence even suggesting a killer of deceased, is the revised version of the Farmer narrative.'' The jury heard Paul Farmer's testimony, his searching cross-examination and his explanation of his failure to identify appellant at the first trial. Having been believed and in effect exonerated by the jury for his dereliction at the first trial, his testimony comes to this court with the sanctity of the sovereign whose agent the jury was in determining the credibility of the witnesses and the weight to be given their testimony.

The instruction correctly defined deliberation (*People* v. *Thomas*, 25 Cal.2d 880, 898, 901 [156 P.2d 7] ; *People* v. *Bender*, 27 Cal.2d 164, 181 [163 P.2d 8] ; *People* v. *Bernard*, 28 Cal.2d 207, 211 [169 P.2d 636] ) ; it properly omitted mention of section 1105, Penal Code, since it was not indicated by the evidence (*People* v. *Lindley*, 26 Cal.2d 780 [161 P.2d 227] ) ; it correctly defined manslaughter (Pen. Code, § 192; *People* v. *Valentine*, 28 Cal.2d 121, 137 [169 P.2d 1] ), and the distinction between the degrees of murder followed the most recent utterances of the Supreme Court. (*People* v. *Holt*, 25 Cal.2d 59, 91 [153 P.2d 21].)

### The Degree of Murder Was Determined

 In an elaborate argument appellant contends that the degree of murder committed was not found by the jury, despite the language of the verdict that ''We further find it to be murder of the first degree, and recommend . . .'' However, he premises his argument upon one passage from the instruction on murder and manslaughter, to wit: ''All murder which is committed willfully, deliberately and premeditatedly is murder of the first degree. All other kinds of murder are of the second degree.'' He follows that quotation with an analysis of section 189 of the Penal Code to show that murder of the first degree has 13 characteristics besides that of ''willful, deliberate and premeditated killing,'' and concludes his argument with the unique proposition that when the court said ''all other kinds of murder are of the second degree'' it intended thereby to direct the jury to classify all of the ''thirteen distinct cases as second degree murder.'' Such argument disregards logic. The first three means of committing first degree murder specified in section 189 necessarily require willfulness, deliberation and premeditation. Since none of those means was alleged or indicated by the evidence the

court's aim was evidently to confine the jury's consideration of murder in the first degree to any means used or manner of performance that was willful, deliberate and premeditated, and if it was not so committed it was murder of the second degree. By omitting the list of means by which foul murder is committed or the list of the several crimes in the commission of which a homicide becomes murder the court did not change "the standard fixed by law." The instruction did inform the jury "as to the elements of each of the degrees of murder." Nothing is found in the authorities cited by appellant (*People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7] ; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]) derogatory of the criticized instruction.

### INSTRUCTION ON REHABILITATION

Appellant assigns as prejudicial the instruction on "rehabilitation." Before quoting it the events that preceded it will be first narrated. When the murder of Mrs. Struck occurred Paul Farmer was a lad of 15. When called before the grand jury in November, 1943, he testified that on the evening of April 5, 1943, he saw deceased in front of her back window but saw only the gray arm sleeve of the man who was present; that he heard the latter's voice and it was not that of appellant. In January, 1944, he testified at the first trial that it was not Weatherford, and at about that time he made extrajudicial declarations of the same import. At the trial in April, 1946, his testimony varied in one material respect from that given in 1944. A résumé of his testimony at the second trial has already been recited above. He testified that the reason he did not admit at the first trial or testify before the grand jury that it was appellant in the storeroom with Mrs. Struck was his fear that the defendant might harm a member of his family. As a reason for the rehabiltation instruction it was developed that in the fall of 1944 and at other subsequent times the witness had told several persons including Mrs. Merle Miller that he recognized appellant at the scene of the murder.

The criticized instruction is as follows : *Rehabilitation.* "The court further instructs the jury that upon the cross examination of Paul Farmer certain questions were asked from which it might be inferred that Paul Farmer had fabricated his testimony at this trial, or that Paul Farmer had base or ulterior motives, or that his testimony in court at this trial was a recent fabrication. Following such inferences or attempts by

counsel for the defense to impeach Paul Farmer, certain testimony was given by Mrs. Merle Miller on behalf of the prosecution of statements made by Paul Farmer to her in November of 1944 and in June or July of 1945.

"The court instructs you at this time that in admitting the testimony of Mrs. Merle Miller of what Paul Farmer told her on these occasions, such testimony was not received for the purpose of proving the truth of the facts which had been told to her by Paul Farmer, but solely and for the limited purpose of refuting the suggestions or inferences, if any, that Paul Farmer had at this trial fabricated his testimony or that his testimony was actuated by base or ulterior motives. Mrs. Merle Miller's testimony of what Paul Farmer said to her on these occasions is introduced and received into evidence to prove the state of mind of Paul Farmer on a date prior to this trial, for the purpose of determining whether his state of mind at that time was the same as disclosed at this trial and to prove that his testimony at this trial was not a fabrication. It is admitted for the limited purpose of rehabilitating Paul Farmer's testimony at this trial." (*People* v. *Nobles,* 44 Cal.App.2d 422 [112 P.2d 651]; *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794]; *Barkly* v. *Copeland,* 74 Cal. 1 [15 P. 307, 5 Am. St.Rep. 413]; *People* v. *Doyell,* 48 Cal. 85, 90; *People* v. *Shaw,* 36 Cal.App. 441, 445 [172 P. 401].)

The authorities cited on the instruction establish its correctness. ▪ Where it appears that the jury might from the cross-examination of a witness draw inferences that his testimony given on the trial is of recent fabrication, prior extrajudicial statements of the witness consistent with his recent testimony will be admitted to rehabilitate it. After such prior statements have been placed before the jury they are to determine whether the witness under attack had fabricated his testimony given before them. (*People* v. *Nobles, supra.*) The instruction complies with the law and was therefore not erroneous.

## FAILURE TO EXPLAIN

▪ The court's instruction that defendant's failure to explain the suspicious circumstances or to deny incriminating testimony presented against him, having a reasonable opportunity to do so, was in conformance with the Constitution, the statutes and the decisions. "That evidence is to be estimated not only by its own intrinsic weight, but also according to the

evidence which it is in the power of one side to produce and of the other to contradict; . . .'' (Const., art. I, § 13; Code Civ. Proc., § 2061, (6); *People* v. *Adamson,* 27 Cal.2d 478, 488 [165 P.2d 3].)

#### REFUSED INSTRUCTIONS

The five instructions on circumstantial evidence offered by appellant and refused were unnecessary. The court's instruction heretofore quoted was sufficient. Those rejected were mere arguments upon the court's instruction that the circumstances ''must be consistent with guilt and inconsistent with any other rational conclusion.'' Such instruction is ''intelligible and free from doubt'' and was in accordance with that approved in *People* v. *Navarro,* 74 Cal.App.2d 544, 550 [168 P.2d 265]. The refused instruction number eight was an attempt to have the court decide a question of fact. Refused instruction five was equivalent to directing the jury to disregard the statements of the district attorney in his opening statement as to proof of other crimes. The same subject was fully covered by the court's ''General Instruction to consider evidence only.''

The judgment and the order denying the motion for a new trial are affirmed.

WILSON, J.—I concur in the opinion of the presiding justice, and join in the judgment of affirmance. It would be inaccurate to say that appellant denied participation in the crime. His evidence consisted solely in a bare denial that he struck the lethal blow, but he never denied participation in the murder. His entire testimony is composed of his answer to a single question from his counsel: ''Q. Did you ever strike a woman by the name of Mary A. or known as M. A. Struck? A. No, sir.'' The court sustained objections to all questions asked by the district attorney on cross-examination. The answer might possibly have been technically true. Insofar as appellant's evidence is concerned the murder may have been committed by another person at his instigation and in his presence.

McCOMB, J.—I dissent. In my judgment the majority opinion is erroneous in holding that it was not prejudicial error for the trial court to instruct the jury as follows:

''In determining the intention of the defendant at the time of the transaction complained of, it is important to consider

the means used to accomplish the killing. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity.

"The willful use of a deadly weapon without excuse or provocation, in such a manner as to imperil life, generally indicates a felonious intent."

This identical language was condemned by the Supreme Court in *People* v. *Peterson*, 29 Cal.2d 69, 77 et seq. [173 P.2d 11], the court, speaking through Mr. Justice Schauer, saying at page 78, ". . . that the instruction . . . should not be given in a case such as this, where a defendant does not concede participation in the transaction." The erroneous instruction did not cause a reversal of the judgment in the Peterson case for the reason as stated by the court that the case was not "a close one and no miscarriage of justice is shown as a result of the giving of the instruction."

In the instant case defendant specifically denied participation in the crime, and in my judgment such erroneous instruction was prejudicial in view of the fact that the evidence was entirely circumstantial and the only evidence identifying defendant as a participant in the crime was given by the witness Farmer, an admitted perjurer.

That this conclusion is unavoidable, that is, that the case was a close one and that the concededly erroneous instruction was prejudicial, is supported by the following facts:

First: It is conceded that all of the evidence is circumstantial with the exception of the testimony of the witness Farmer a self-confessed perjurer, who at the time he testified was on probation after conviction of a criminal offense, and who had testified before the grand jury in November, 1943 that in looking out of his window on April 5, 1943 into the Oh Johnnie Cafe he had seen only a part of an arm of a man and that the man's voice he had heard was not that of defendant. He gave similar testimony at a prior trial of the present case in January, 1944. Likewise, on December 15, 1943, he stated to Mr. Hyde and Mr. Mason that defendant was not the man whose voice he had heard on the evening of April 5, 1943. Again in March, 1945, and in 1946, he made a similar statement to Mrs. Elsie Weatherford.

In the case of *People* v. *Weatherford*, 27 Cal.2d 401 [164 P. 2d 753], our Supreme Court held on evidence substantially the

same as that set forth in the majority opinion, with the exception of the testimony of the perjurer Farmer, that such did not constitute sufficient evidence to make applicable the provisions of article VI, section 4½ of the Constitution relative to an erroneous instruction which had been given.

It should be borne in mind that the only material addition to the evidence in the instant case over that appearing in *People* v. *Weatherford*, 27 Cal.2d 401 [164 P.2d 753], is the testimony of the witness Farmer.

Second: The justices of this court, men trained in evaluating evidence and the conclusions to be drawn therefrom, have differed as to the conclusions to be reached from the present record. It is therefore self-evident that an untutored lay jury must have had extreme doubt as to the sufficiency of the evidence to sustain the conviction, and clearly this court should not say that a concededly erroneous instruction in a case where the evidence is entirely circumstantial, and the defendant denied participation in the crime is not prejudicial to the substantial rights of the defendant, and that a "miscarriage of justice" did not result from the erroneous instruction.

Third: The extreme length of the majority opinion illustrates the extreme tenuousness of the evidence of guilt in the present case.

It has been held in many cases the phrase "miscarriage of justice" as used in article VI, section 4½ of the Constitution does not mean simply that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable as pointed out by Mr. Justice Carter in *People* v. *Weatherford, supra,* 420, to cases where the conviction has resulted from some form of trial in which an essential right of the defendant has been disregarded or denied.

I therefore adhere to the former opinion* of this court and believe that the judgment should be reversed and a new trial granted.

Appellant's petition for a hearing by the Supreme Court was denied April 17, 1947. Carter, J., and Schauer, J., voted for a hearing.

---

*The opinion concurred in by all members of this court reversing the judgment and granting a new trial, filed on January 14, 1947, appears in 77 A.C.A. 708 [176 P.2d 382].